[File No. 7237]

M. C. EMERY, Appellant, v. MIDWEST MOTOR EXPRESS
INC., a domestic corporation, Respondent.
and
M. C. EMERY, Respondent, v. MIDWEST MOTOR EXPRESS
INC., a domestic corporation, Appellant.

(54 NW2d 817)

28

Opinion filed August 26, 1952

*J. E. Hendrickson, G. L. Dosland,* for plaintiff,
*Strutz, Jansonius & Fleck,* and *Wattam, Vogel, Vogel & Bright,* for defendant.

CHRISTIANSON, J.   This is an action to recover damages alleged to have resulted from a collision between a Ford pickup truck owned and driven by the plaintiff and a tractor and semitrailer owned by the defendant and driven by its employee, Martin Henry.   It is alleged in the complaint that the collision was caused by the negligence of said defendants' employee. It is further alleged in the complaint that as a result of the

collision the plaintiff sustained personal injuries and that the Ford pickup truck driven by him was damaged all to the damage of the plaintiff in the sum of $103,457.87. In its answer the defendant admits that an accident occurred on September 10, 1948, within the City of Fargo in this state in which an automobile driven by the plaintiff collided with the truck owned and operated by the defendant. All allegations in the complaint except those specifically admitted are denied. The defendant by way of further answer alleges that if the plaintiff sustained the injuries and the damages as alleged in the complaint, such injuries and damages and the accident causing the same were the direct and proximate result of the negligence of the plaintiff and that plaintiff's negligence contributed to the happening of the accident. The case was tried to a jury upon the issues framed by the pleadings. At the close of plaintiff's case and again at the close of all the evidence and after both parties had rested, the defendant moved the court to direct the jury to return a verdict for the defendant and against the plaintiff on the grounds that the evidence conclusively shows that the accident and the resulting injuries to the plaintiff, if any, were proximately and directly caused by the negligence of the plaintiff and that the negligence of the plaintiff contributed to the happening of the accident. The motions were denied and the case submitted to the jury. The jury returned a verdict in favor of the plaintiff and against the defendant for $32,500.00. Judgment was entered pursuant to the verdict. Thereafter the defendant moved in the alternative for judgment notwithstanding the verdict or for a new trial. After due hearing the trial court made and filed a memorandum and order wherein he said:

"The court has reviewed the testimony taken at the trial together with the exhibits offered and received in evidence. Such review convinces this court that, even though the plaintiff's contentions were uncontroverted and the defendant had conceded liability for the collision and resulting damage, the amount awarded to plaintiff by the jury is far in excess of any damages for which said plaintiff offered competent proof at the trial. This court is of the opinion that an award of $3250.00 would be ade-

quate compensation to plaintiff for the damages resulting from the accident.

"It is ordered, therefore, that defendant's motion for judgment notwithstanding the verdict be denied; that the judgment entered upon the verdict of the jury against the above named defendant for the sum of $32,500.00 and costs, be reduced to $3250.00 and costs; that in the event that plaintiff does not file a written consent to such reduction on or before October 20th, 1950; this court will enter its order vacating the judgment against said defendant, vacating and setting aside the verdict of the jury, and granting a new trial upon the motion of defendant therefor heretofore made."

Shortly thereafter the trial court made and entered an order wherein it is said:

"It is ordered: Defendant's motion for Judgment Notwithstanding the Verdict is denied.

"The Court specifically finds that the jury's verdict of $32,500.00 for the plaintiff was far in excess of any competent proof offered by the plaintiff, and that such verdict was influenced by the passion and prejudice of the jury. The Court further finds that such passion and prejudice did not affect the other issues of this lawsuit. It is accordingly,

"Ordered: In the event the plaintiff does not before October 20, 1950 file with the clerk of this court his written consent reducing the judgment herein from $32,500.00 and costs to $3,250.00 and costs, the defendant shall have a new trial herein, and the judgment heretofore entered shall be vacated and the verdict set aside."

The plaintiff refused to consent to a reduction of the amount of the judgment as provided in the orders of the court and on October 23, 1950, the court made an order referring to its former orders and providing further that:

"It is, ordered:

"1. Defendant's motion for Judgment Notwithstanding the Verdict is denied.

"2. The defendant is granted a new trial, and the judgment herein in favor of the plaintiff and against the defendant in the

sum of $32,537.05, dated May 23, 1950, is vacated and the verdict in this lawsuit is set aside."

The plaintiff appealed from both of these orders. The defendant also appealed from both orders. One of the specifications of error on the appeal of the defendant is predicated upon the proposition that the defendant was entitled to a directed verdict. The motion for a directed verdict was based upon the ground that "the evidence conclusively shows that this particular accident and the resulting injuries, if any, to the plaintiff were proximately and directly caused by the negligence of the plaintiff and that the negligence of the plaintiff contributed to the happening of the accident." It seems desirable to consider and determine the question thus raised before other specifications of error are considered because if the evidence conclusively shows that the accident and resulting injuries were proximately and directly caused by the negligence of the plaintiff and that the defendant is entitled to judgment notwithstanding the verdict, then, of course, the other assignments of error would become immaterial.

It is admitted that a collision occurred on September 10, 1948, at the corner of 13th Street North (U. S. Highway No. 81) and First Avenue North (U. S. Highway No. 10) in the City of Fargo in which a Ford pickup truck driven by the plaintiff collided with a tractor and semi-trailer truck owned by the defendant and operated by one of its employees. On the morning of September 10, 1948, shortly after 6 o'clock in the morning of that day the plaintiff drove a 1946 half ton Ford pickup truck in a northerly direction on said 13th Street which is also U. S. Highway No. 81 and he approached the point where 13th Street intersects First Avenue North. The plaintiff testified that as he was approaching the intersection of such two streets he was driving at a speed of about 20 to 22 miles an hour; that when he had reached a point about 15 or 20 feet south of the south curb line of said First Avenue North he looked to the left and saw no cars or vehicles approaching the intersection on said First Avenue North; that after looking to the west he kept on going north and as he was about to enter the intersection he looked to the right or east and saw a Midwest Motor Express

Company truck approaching the intersection from the east, and that he estimated that the Midwest Motor Express Company truck was about 50 or 60 feet east of the curb line on the east side of 13th Street; that the right rear fender of his truck was struck by the Midwest tractor; that he feels certain that his pickup truck was rolled over; that tools and certain material he had in the pickup truck were strewn over the street; that after the accident the pickup truck stopped in the driveway of a Texaco station on the west side of 13th Street and north of First Avenue North; that it was standing on its wheels and apparently had turned over and righted itself; that it faced toward the west; that he thinks that the place where the pickup stopped and came to rest was 46 feet north of the north curb line of First Avenue North; that the defendant's truck, that is, the front wheels of the tractor were about a foot and a half onto the boulevard off the street on the west side of First Avenue North, that is, that the front wheels of the Midwest tractor were north of the north curb line on First Avenue North and up on the boulevard; that when his truck was hit by the defendant's truck he was north of the center line of First Avenue North and had already started out of the intersection.

Martin Henry, the driver of the defendant's truck, testified that he had driven the truck from St. Paul, Minnesota, that it was loaded and that his destination was Fargo; that in the morning of September 10th he was driving in a westerly direction on First Avenue North in Fargo at a speed of about 20 miles an hour; that the stop and go signals were operating and that at the intersection of 13th Street and First Avenue North the stop lights "were on caution," that there was a flickering sign, that he was in fourth gear under because as he was approaching he saw the light was caution, and approximately 40 or 50 feet from the entrance to the intersection he shiftd to a lower gear,—to third under; that he looked to the left and did not see any vehicles traveling on 13th Street, either north or south, that he then looked to the right when he was approximately 20 or 30 feet away from the east curb on 13th Street and that he could see no vehicles coming from the north;

that when he came into the intersection he looked to the left and noticed a Ford pickup coming toward him, that this pickup was going north, that at this time he was near the east sidewalk in the intersection, that is, the sidewalk just east of 13th Street for travel in a northerly and southerly direction; that when he saw the Emery truck he would say it was about 15 feet south of the sidewalk and was coming very fast; that he started to turn the truck he was driving to the right, that before that he applied his brakes, that the brakes operated on the tractor and trailer together, that as he came into the intersection he was traveling at a rate of approximately 13 to 15 miles per hour; that he did not negotiate the turn to the right, that just the tractor part started to turn; that the left front bumper of the tractor came in contact with the right rear fender of Emery's truck; that after the contact the pickup went on and hit a stop and go signal at the northwest corner of the intersection and then went off up 13th Street and stopped; that the pickup driven by Emery did not turn over; that he estimates that the point where the pickup truck stopped on 13th Street was approximately 25 feet north of the intersection and that when it stopped the truck was facing west; that immediately prior to and at the time of the collision he was driving in a westerly direction in the north lane of travel, and about four feet north of the center line of First Avenue North.

Both Emery and Henry agree that it was a clear day, that there were no cars parked on the streets near the intersection and that there were no vehicles operating on either of the streets. Vernon Jorgenson, a member of the police force of the City of Fargo, testified that he received a radio order concerning the collision at 6:08 that morning and that he at once went to the scene of the accident; that he found the Midwest truck with the right front wheel of the tractor part on the boulevard on the northwest corner of the intersection, that the tractor and semi-trailer were facing west, that he investigated to ascertain whether there was any indication of brake marks and that he found such marks and measured them; that one of the marks was 15 feet in length and the other 16 feet in length; that they

extended from the rear tires of the trailer toward the east,— that the course was a "little bit of an angle northwesterly;" that the marks started a little east of the east crosswalk on 13th Street, that such walk is approximately 8 feet east of the curb on 13th Street, that the right front wheel of the tractor came to rest on the boulevard over the curb on the west side of 13th Street, that the tire marks were in the north lane of travel on First Avenue North, that the point of impact of the collision was north of and just past the center line of First Avenue North. That he talked with both drivers, that he asked Henry what had happened and that to the best of his recollection Henry said he had not seen the pickup coming; that he made a record of the license number of the defendant's truck and such matters as are reported in the investigation of an accident of this character.

Questions of negligence and contributory negligence and proximate cause are generally questions of fact for the jury. They become questions of law only when the evidence is such that reasonable minds cannot reasonably draw different conclusions either as to the facts or the deductions to be drawn therefrom. Dougherty v. Davis, 48 ND 883, 187 NW 616; Fitzmaurice v. Fitzmaurice, 62 ND 191, 242 NW 526; Logan v. Schjeldahl, 66 ND 152, 262 NW 463. After considering all the evidence in this case we have reached the conclusion that the questions of negligence and contributory negligence were for the jury and that it cannot be said as a matter of law that the plaintiff was guilty of contributory negligence.

Error is assigned by the defendant upon the admission of testimony to the effect that after the accident Martin Henry, the driver of defendant's tractor and semi-trailer, said that he did not see the pickup truck coming. This statement was made to the policeman who had come to the scene in response to a radio order. The policeman asked what had happened and the driver Henry then, according to the testimony of the policeman and a bystander Hammett, an employee of the plaintiff Emery, said: "I did not see the pickup coming." This occurred within minutes after the collision took place. The parties were still there. Their vehicles were in the positions in which they

were placed after the collision. At the beginning of the introduction of testimony in the case and during the examination of the president of the defendant company it was stipulated that at the time of the accident Henry was employed by the defendant company, was on the business of the defendant company and acting within the scope of his employment. The statement by the driver Henry was made within minutes after the accident had occurred. The driver Henry was still in charge of and the operator of defendant's truck. The task entrusted to him by the defendant had not been completed. It was still part of his duty to complete the journey and to deliver the loaded truck at the terminal in Fargo. We think that the testimony as to the statement by the driver Henry was admissible. Myers v. Hagert Construction Co., 74 ND 435, 23 NW2d 29; Rivera v. United Electric Rys. Co. (RI) 151 Atl 130; Barrett v. Chicago, M. & St. P. Ry. Co., 190 Ia 509, 175 NW 950, 180 NW 670; Williams v. Western Union Telegraph Co., 138 SC 281, 136 SE 218; Washington-Virginia Ry. Co. v. Deahl, 126 Va 141, 100 SE 840; Snipes v. Augusta-Aiken Ry. & Electric Corporation et al., 151 SC 391, 149 SE 111; Wilcox v. Berry et al. (Cal App) 184 P2d 939; Wilcox v. Berry et al., 32 Cal2d 189, 195 P2d 414; Mulich v. Graham Ship By Truck Co., 162 Kans 61, 174 P2d 98; Personius v. Asbury Transp. Co. of Oregon, 152 Ore 286, 53 P2d 1065.

Plaintiff contends that the court erred in granting a new trial on the ground of excessive damages appearing to have been given under the influence of passion or prejudice. The laws of this state provide that the verdict may be vacated and a new trial granted on such ground on the application of the party aggrieved. NDRC 1943, 28–1902, subd 5.

In its original form the statute provided that a verdict might be vacated and a new trial granted on the application of the party aggrieved for "excessive damages appearing to have been given under the influence of passion or prejudice." C. L. 1913, Sec 7660. Under this statute the court had no authority, where a motion for a new trial was made "on the ground of excessive damages appearing to have been given under the influence of passion or prejudice" and it appeared to the court that a verdict

had been so given, to require the successful party to remit the excess or as an alternative to proceed to a new trial of the case. If it appeared that excessive damages had been given under the influence of passion or prejudice, the party against whom the verdict was rendered was entitled to a new trial and the court had no authority to require the successful party to remit the excess or proceed to a new trial. Waterman v. Minneapolis, St. P. & S. Ste. M. Ry. Co., 26 ND 540, 145 NW 19.

The statute was amended and reenacted by the Legislative Assembly in 1923 to read as follows:

"Excessive damages appearing to have been given under the influence of passion or prejudice. Where a new trial is asked for on this ground, and it appears that the passion and prejudice affected only the amount of damages allowed, and did not influence the findings of the jury on other issues in the case, the trial court on hearing the motion, and the supreme court on appeal, shall have power to order a reduction of the verdict in lieu of a new trial; or to order that a new trial be had unless the party in whose favor the verdict was given remit the excess of damages." Laws 1923, Ch 334.

And the statute as so amended and reenacted was embodied in NDRC 1943, 28–1902, subd 5 without any material change.

Where a motion for a new trial is made on the ground of excessive damages appearing to have been given under the influence of passion or prejudice the duty is placed upon the trial court to whom the motion is addressed to consider and weigh the evidence. "This necessarily involves an exercise by the trial judge of the superior knowledge possessed by him as to matters incident to the trial itself." A motion for a new trial based on such ground is addressed to the sound judicial discretion of the trial court and its ruling will be disturbed only when an abuse of discretion is clearly shown. Reid v. Ehr, 36 ND 552, 162 NW 903; Green v. Soule, 145 Cal 96, 78 Pac 337.

In Reid v. Ehr, supra, this court said:

"In actions in which there is no definite or legal measure of damages, as is especially true in most actions sounding in tort, the quantum of damages is deemed a matter of discretion for the jury to such an extent that the verdict will not be set aside

on this ground alone, unless the amount awarded is so excessive as to appear to have been given under the influence of passion or prejudice. The discretion of the jury in fixing damages in such cases is not absolute, however, and 'in whatever form the rule is stated, it always involves a reasonable discretionary power in the court to set aside a verdict when its amount, in view of all the circumstances, is so great as to show that the jury, in arriving at it, must have been influenced by some improper motive.' 4 Sedgw Damages, 9th ed., Sec 1326.

"In this state the statute confers express authority upon the district court to grant a new trial for 'excessive damages appearing to have been given under the influence of passion or prejudice,' on the application of the party aggrieved. Comp Laws 1913, Sec 7660. Or even without such application, upon the court's own motion, 'when there has been such plain disregard by the jury of the instructions of the court or the evidence in the case as to satisfy the court that the verdict was rendered under a misapprehension of such instructions or under the influence of passion or prejudice.' Comp Laws 1913, Sec 7665. These statutory provisions clearly, not only vest in the trial court the power to set aside a verdict returned under the influence of passion or prejudice, but imply a duty on the part of the court sometimes to set aside such verdicts."

The evidence shows that after the collision the plaintiff commenced to pick up tools and other articles that had been thrown out of his pickup truck and when one of his employees who had arrived wanted to take him home plaintiff said he wanted to get the things picked up. Later the employee took plaintiff to his home in a cab and a doctor was called who sent him to St. Luke's Hospital in Fargo and placed him under the care of Dr. Hall, a member of the Fargo Clinic. Dr. Hall testified that he saw the plaintiff at the hospital at approximately 9 o'clock in the morning of September 10, 1948, that the plaintiff complained of pain in the region of the back and over the left lower chest. That Dr. Hall ordered x-rays to be taken of the back. That on examining these x-ray photographs he saw no evidence of fracture or serious difficulty with the vertebrae or the back. That he made a complete and thorough examination of the back itself,

examined the muscles for spasm and the lower extremities for nerve involvement. That there was no evidence of nerve injury, that there was evidence of some muscle spasm indicating that the plaintiff had some pain of some sort at that time. That he called in Dr. Fortin, a specialist in orthopedic surgery, on the day following plaintiff's admission to the hospital and that he (Dr. Hall) and Dr. Fortin examined the x-rays together. That Emery was discharged from the hospital on September 13, 1948. Dr. Fortin testified that he was called in consultation while Emery was in the hospital after the accident. That he examined the x-rays that had been taken of Emery's back and spine. Dr. Fortin said, "they thought at first he might have some slipping of the vertebrae. But we went over them carefully and we didn't find any slipping forward. We found a normal x-ray of the back." That "he (Emery) complained of an area of pain. . . . But to have pain as much as he stated he had, he should have had other findings along with it, muscle spasm or limitation of motion, which I could not make out. . . . You can injure the low back soft tissues without injuring the bone and still have pain, but it will show up in limitation of motion or muscle spasm." That Emery complained of a lot of pain but that he (Dr. Fortin) could not find anything to justify that.

The plaintiff testified as to calls on doctors and treatments, and that he was not receiving any relief, that he was very nervous and in a lot of pain and that finally he called Dr. Hall on the telephone and asked him to make an appointment for him at Rochester. That Dr. Hall answered that he did not think this was necessary, that thereafter about October 18, 1948, the plaintiff went to Rochester without an appointment and entered the Mayo Clinic and remained there for about a week. That he was examined by four different doctors at the Mayo Clinic and that x-rays were taken of his back. That the doctors gave him no treatment and told him to continue wearing a brace or belt that had been prescribed by Dr. Fortin and to continue to sleep on a board as Dr. Fortin had recommended and to come back to the Clinic in approximately three months. He did not go back. The x-rays taken at Rochester were not produced upon the trial nor was the testimony of any of the doctors who examined

him at the Mayo Clinic in Rochester offered. About January, 1949, the plaintiff consulted one Dr. Keal, a doctor of chiropractic at Moorehead, Minnesota. Dr. Keal took some x-rays of the plaintiff's back and gave him some chiropractic treatments. Dr. Keal testified that there was no fracture of any of the vertebrae and that if he had been suspicious of a fracture he would have referred the case to a medical doctor and that if he had found or seen anything gravely wrong with any of the vertebrae he thinks he would have referred the plaintiff to Dr. Fortin. He did testify that from a chiropractic point of view there was something abnormal about the plaintiff's cervical vertebrae, but that a large number of cases coming to his office, probably more than fifty percent, indicated a tilting of vertebrae one way or the other. That there were no fractures at all. That there was "a minute displacement, what we call in our profession a subluxation."

After consulting Dr. Keal the plaintiff went to a chiropractic clinic in South Dakota where he took a number of treatments.

Dr. Swanson, a specialist in orthopedic surgery in Fargo, North Dakota, and who had been engaged in practice as such specialist for some 22 years, was called and testified. He testified that he examined the plaintiff Emery in March, 1950, at the request of one of defendant's attorneys. Dr. Swanson described in some detail the examination made by him. Dr. Swanson said: "He was stripped and we examined him from head to foot especially in relation to his spine, his pelvis and his extremities, with a checkup specially on his neurological changes, reflexes, to see whether or not he might have some damage to his spinal cord and nerve roots." He further testified that certain x-rays were taken of his neck, his dorsal and lumbar spines, and his pelvis. The doctor produced such x-ray photographs and they were offered and received in evidence. The doctor further testified that the x-ray photographs showed no abnormality, that there was nothing to indicate that there was anything abnormal or wrong with any of the vertebrae except that one of the x-rays gave evidence of a low grade osteoarthritis of the spine, that that condition had existed for a long time and had existed prior to the accident in September,

1948. Dr. Swanson said there was no evidence of any fracture of any kind or of any dislocation of the spine or vertebrae and that he saw nothing that would indicate a fracture or injury of any kind.

It will be noted there were no objective symptoms of plaintiff's injuries. According to the evidence no injury was apparent even with the aid of x-ray photographs of the portion of the body which it was claimed had been injured resulting in severe pain. Proof of the extent of the injury rested almost wholly upon the word of the plaintiff. It has been said by the Supreme Court of Minnesota that in such circumstances a large verdict is subjected to close scrutiny. Propper v. Chicago, R. I. & Pac. Ry. Co. 237 Minn 386, 54 NW2d 840, 35 ALR2d 459; Johnson v. G. N. Ry. Co. 107 Minn 285, 119 NW 1061; Haugen v. N. P. Ry. Co. 132 Minn 54, 155 NW 1058; Levan v. C. R. I. & P. Ry. Co. 158 Minn 69, 196 NW 673; Becker v. Megan, 204 Minn 283, 283 NW 401.

In this case the jury returned a verdict in favor of the plaintiff for $32,500.00. This is a large verdict. It is not for us to say whether the damages awarded were so excessive as to appear to have been given under the influence of passion or prejudice. That was a matter for the trial judge to determine and the function of this court is to review the ruling of the trial court on such motion to ascertain whether the trial court in granting a new trial abused his judicial discretion and thereby effected an injustice. Reid v. Ehr, supra. We are all agreed that under the facts and circumstances in this case it cannot be said that the trial court abused the discretion vested in him by ordering a new trial.

What has been said disposes of plaintiff's appeal. However, on its appeal the defendant has assigned error on certain rulings and presented certain questions which seem likely to arise upon another trial. Mr. Roswick, the president of the defendant company, was called for cross-examination under the provisions of NDRC 1943, 31–0202, which provides that a party to the record of any civil action or an officer of any corporation which is a party to the record of the action, at the instance of the adverse party may be examined upon the trial of the action "as

if under cross-examination and for that purpose may be compelled to testify in the same manner and subject to the same rules for examination as any other witness. However, the party calling for such examination shall not be concluded thereby but may rebut it by counter testimony." On the cross-examination Roswick was examined by plaintiff's counsel at length as to how many trucks the defendant company was operating, how many branch offices it had and matters of that kind. To the admission of this testimony defendant's counsel interposed timely objections. The objections were overruled and the examination permitted to continue along this line on the asserted ground that it was cross-examination under the statute. (NDRC 1943, 31–0202). The purpose and effect of this statute (NDRC 1943, 31–0202), was considered by this court in Whipple v. First National Bank, 57 ND 844, 224 NW 297; Hunder v. Rindlaub, 61 ND 389, 237 NW 915.

In Whipple v. First National Bank, supra, this court said:

" 'The statute means simply this: that any party to the record may be called as a matter of right for cross-examination by the other party to the action, where the record shows that there is an issue between them to be tried.' . . .

"The right to call any such witness existed before the enactment of the statute. The only effect of the statute is to permit him to be examined 'as if under cross-examination' and to remove from the party calling him a sponsorship that would prevent him from rebutting his testimony." 57 ND at pp 847–848.

In Hunder v. Rindlaub, supra, this Court said:

"The purpose of the statute was to permit a party to an action to call the adverse party,—or, where a corporation is a party, a director officer, superintendent or managing agent thereof,—and to examine such party as regards some pertinent fact involved in the controversy. It was recognized that such party might, and probably would, possess knowledge pertinent to the inquiry; that such party probably would be an unwilling witness; and that his interests might, and probably would, be adversely affected by the testimony sought to be elicited; so it was provided, that he might be examined under the rules of cross-examination, that is, subjected to leading questions, and

that his testimony should not be binding upon the party calling him." 61 ND at pp 409–410.

In considering a similar statute the Supreme Court of Minnesota said:

"The object of the statute was to permit a party to call his adversary at the trial, without making him his own witness, and elicit from him, if possible, material facts within his knowledge by a cross-examination, precisely as if he had already been examined on his own behalf in chief." Suter v. Page, 64 Minn 444, 67 NW 67.

As was said by this court the purpose of the statute was to permit a party to an action to call the adverse party or where the adverse party is a corporation to call a director, an officer, or managing agent thereof and to examine such party "as regards some pertinent fact involved in the controversy," under the rules of cross-examination so as to remove from the party calling him a sponsorship which would prevent him from rebutting the testimony so elicited on cross-examination. The statute was never intended to permit an examination to elicit proof as to some irrelevant collateral subject such, for instance, as the financial ability of the defendant in an action for compensatory damages as was attempted to be done in this case.

This action was brought to recover compensatory damages only. There was no basis for the allowance of exemplary or punitive damages. The questions in the case were whether the plaintiff had been injured as a result of the negligence of the defendant's employee in the operation of the particular truck owned by the defendant involved in the accident and, if so, the amount that plaintiff was entitled to recover to compensate him for such injury. If plaintiff was so injured, then he was entitled to a verdict for the amount of his loss without regard to whether the defendant owned and operated only the truck that was involved in the accident or whether it owned and operated a thousand additional trucks. "The financial condition of the parties involved has ordinarily no bearing upon the amount to be awarded as compensatory damages. Hence, as a general rule, admission of evidence as to the pecuniary condition or financial circumstances of defendant is error where only

44

·such damages may be awarded." 25 CJS, p 562, sec 71. The evidence elicited on cross-examination over the objection of defendant's attorney as to the number of trucks the defendant owned and operated, the number of branch offices it maintained and the extent of its business was not pertinent to the issues involved on the trial and it was error to allow such evidence to be introduced. Taulborg v. Andresen, 119 Neb 273, 228 NW 528, 67 ALR 642; Washington-Virginia Ry. Co. v. Deahl, 126 Va 141, 100 SE 840; Jones v. Carter, 192 Miss 603, 7 So2d 519; Stewart v. Mutual Clothing Co., 195 Misc 244, 91 NYS2d 338.

Defendant also .assigns error upon the court's rulings in the admission of the testimony of the plaintiff Emery with respect to the value of his services in the conduct of his business. The plaintiff Emery was engaged in the excavation business,—in excavating basements and work of that type. He operated and conducted his own ·business and he owned machinery adapted for the performance of the work and employed men to operate the machines and to work on the various jobs. It is the claim of the plaintiff that as the result of his injury he has been and will be unable to perform the work which he formerly performed and hence unable to conduct the business. On his examination as a witness plaintiff's counsel asked the plaintiff the following question: "The question, Mr. Emery, is what in your opinion was the value of your services to your business, prior to your injury, how much per year?" Defendant's counsel objected to the question on the ground that it was not a proper subject of expert testimony, that it called for a conclusion of the witness, invaded the province of the jury, was speculative, conjectural and uncertain, that no proper foundation had been laid and that the evidence did not go to show a proper element of damage. The objection was overruled and the plaintiff answered: "Well, I would say that approximately—I don't know how I can estimate that in money. I can't replace myself with anyone. I would say around ten thousand dollars, maybe twelve thousand dollars." After the answer had been given defendant's counsel moved that the answer be stricken substantially on the same grounds that were stated in the objection. The court permitted

the answer to stand. We believe that the objection to the question was well founded. If the plaintiff sustained a loss to the business conducted by him as a result of his injuries he would have the burden of proving such loss by evidence establishing the same with reasonable certainty so that the jury would have evidence of facts from which they might ascertain and determine the amount of damages. The rules to be applied in the proof of loss of earnings or profits in such case were considered and stated by this court in Wilson v. Oscar H. Kjorlie Co. 73 ND 134, 12 NW2d 526.

We are all agreed that the testimony of the plaintiff giving his opinion or estimate as to the value of his services to his business was not admissible and that the court erred in admitting such testimony. Cincinnati Traction Co. v. Stephens, 75 Ohio St 171, 79 NE 235; Schwartz v. Eitel, 132 Fed2d 760; Williamson v. Feinstein, 311 Mass 322, 41 NE2d 185.

This disposes of such assignments of error by the defendant as seem likely to arise upon a new trial and which may properly be determined by this court on this appeal. The orders appealed from are affirmed.

MORRIS, C. J., and SATHRE, BURKE, GRIMSON, JJ., concur.