Marilee K. PERRY, Appellee,

v.

Marian BERTSCH, Appellant.

No. 20404.

United States Court of Appeals,
Eighth Circuit.

April 28, 1971.

Rehearing Denied May 20, 1971.

Patrick A. Conmy, Bismarck, N. D., for appellant; Morris A. Tschider, Bismarck, N. D., of counsel.

William A. Strutz, Fleck, Mather, Strutz & Mayer, Bismarck, N. D., for appellee.

Before MEHAFFY and HEANEY, Circuit Judges, and MEREDITH, Chief District Judge.

MEHAFFY, Circuit Judge.

On November 3, 1965 about 3:30 or 4:00 p. m. Mrs. Marilee K. Perry, the plaintiff, was injured in an automobile accident at the intersection of Avenue C and Fifth Street in the City of Bismarck, North Dakota. Plaintiff, accompanied by her oldest daughter, Tracey, approximately four years of age, was driving a Volkswagen. Plaintiff was traveling East and defendant, Mrs. Marian Bertsch, driving a Lincoln Continental, was traveling North, the cars colliding in the southwest corner of the intersection. It was clear and sunny and the pavement was dry. Both cars were being driven at moderate rates of speed. Plaintiff testified that she was driving approximately fifteen miles per hour and defendant approximately five miles or from five to seven miles per

hour. The Lincoln Continental was only slightly damaged in the area of the left front grille and headlight and defendant was not injured. Plaintiff's Volkswagen was considerably damaged in the right front area.

Plaintiff stated that when she first saw defendant's car it was about thirty feet from the intersection and plaintiff was then about fifty feet from the intersection. Plaintiff testified that she sort of threw herself across in front of her daughter to try to keep her from getting hurt and her daughter fell off the seat underneath her and onto the floor. The child received a cut finger and bruises but was not seriously hurt. Plaintiff's head hit the windshield and her knees hit the dashboard and one knee was cut. A tool box in the back of the car was thrown forward, landing behind Mrs. Perry who was bounced against it.

After investigation of the accident was completed, plaintiff and her daughter were taken home and shortly thereafter her husband took them to Quain & Ramstad Clinic in Bismarck for examination and treatment. The hospital records showed that plaintiff complained of a cut on her knee, a bump on her head, and headaches, and listed her daughter's injuries as bruises. She was examined by Dr. Earl Peterson and released with the suggestion that her condition would probably improve with time and the request that she return the following week for a checkup.

When she returned to the clinic she was complaining of back pain and was X-rayed. Dr. Peterson's report showed contusion of the mid-forehead, the right knee and the mid-back, but X-rays of the spine were negative.

Defendant offered no testimony at the trial and the jury returned a verdict for $350,000.00. The only issue presented to this court is the asserted excessiveness of the verdict. After careful consideration, we have concluded that the verdict, if allowed to stand, would be a plain injustice as it is in our view monstrous and shocking. We, therefore, reverse and remand for a new trial.

We are not unmindful that Professor Moore in 6A Moore, Federal Practice ¶ 59.08[6], at 3834 (2d ed. 1966), characterizes this circuit, along with the Second Circuit, as the most adamant expounders of the old doctrine of nonreviewability of decisions on motion for new trial based on the excessiveness of damages, or that this circuit is even probably more reluctant to set aside or order a remittitur in excessive damage judgments than most, but this can be said to be one of those rare cases where the verdict shocks our conscience. We will refer primarily to plaintiff's testimony and to that of her physicians to show the extent of the personal injuries.

At the time of trial plaintiff was twenty-seven years of age. She was wearing glasses at the time of the accident and had worn them since she was ten years of age for nearsightedness. On November 20, 1965, she complained of blurred and double vision and was referred to Dr. Edwin Perrin, an eye, ear, nose and throat specialist at the Clinic, who found that she had esophoria, i. e., her eyes were focusing in too much at close range. She had one degree of esophoria for distance vision of twenty feet, which is considered acceptable, and three degrees for vision as close as sixteen inches, which is abnormal. Dr. Perrin noted that with regard to vision at twenty feet the Civil Aeronautics Administration would permit an individual to fly a plane with two degrees of esophoria (where the eyes turn in) or exophoria (where the eyes turn out) since a person's eyes would pull that much. He concluded that plaintiff had no impairment of distance vision. Since, however, she was nearsighted and wore glasses the doctor suggested that she could have prisms, or prismatic lenses, to take care of the diplopia, or double vision, but at that time plaintiff thought her vision would improve and did not then obtain the prisms. The retinas of her eyes were normal and she had no apparent diseases. Dr. Perrin diagnosed her con-

dition as "sixth nerve paresis," *i. e.*, a weakness of the sixth nerve, causing her eyes to turn in. He said he could not definitely say that the esophoria was caused by the accident, but that plaintiff told him she had never had it before and that she had a blow on her head which had been known to cause muscle imbalance, and, therefore, it was a medical probability that the esophoria resulted from the accident.

On November 24, 1965 plaintiff was referred by Dr. Peterson, who was leaving the Clinic, to Dr. Dale Orien, an otolaryngologist on the Clinic's staff.[1] He testified concerning Dr. Peterson's records which were introduced into evidence. When Dr. Orien saw her, plaintiff was complaining of diplopia and low back pain which radiated down her right leg. The examination revealed that the range of motion of the lumbar spine appeared normal. She had no deficit in her muscle strength, no sensory loss, and her deep tendon reflexes were normal, all of which indicated that she had no neurologic deficit at that time. She was tender, however, over the right paralumbar muscles, a large bundle of muscles which extend on both sides of the lumbar spine to hold the trunk in a normal position to keep the body erect, and she had tension or spasm there. The doctor saw her again on December 1, 1965, and plaintiff continued to complain of pain over the low thoracic spine or upper lumbar region but did not complain as before of pain extending into her leg. She had slight tenderness over the interspinous ligament in the area of the tenth and eleventh thoracic spine, but no apparent spasm, and her deep tendon reflexes and sensation in motor function of her lower extremities were normal. Dr. Orien felt that she was improved.

In December, 1965, about a month after the accident, plaintiff went to California where she lived with her husband's parents for a while and later with his sister. She consulted three eye doctors while she was in California, and in March of 1966 she and her children went to live with her sister in Boise, Idaho and she consulted an eye specialist there. On April 22, 1966 plaintiff went back to Dr. Perrin for an examination and he found her vision was normal for distance but she still had three and one-half degrees of esophoria for close vision and she was seeing double at closer than approximately sixteen inches.

In October, 1966 plaintiff moved to Ketchikan, Alaska to stay with her parents, and again sought advice and treatment from an eye doctor. In June of 1968 she and the children moved to Seattle, Washington and in September, 1968 to Hermiston, Oregon where they lived until October, 1969. At that time they moved with her parents to Spring Lake, North Carolina, where they were residing at the date of trial.

A Dr. Smith in Ketchikan, Alaska suggested eye exercises which she performed under his supervision for about six weeks with no noticeable benefits, and various doctors changed her lenses. The first set of prisms she had were prescribed by Dr. Smith and they were the clip-on type. The glasses she wore at the date of trial were prescribed about one and one-half years before by Dr. Horstfield in Seattle and they had prisms ground in. She said they made it a little easier for her to concentrate for a longer period of time but that she still saw double.

On February 13, 1968 Mrs. Perry entered the Providence Hospital in Seattle and underwent a spinal fusion the following day performed by Dr. John Nilan, an orthopedic surgeon. Upon her initial visit to Dr. Nilan she complained not only of double vision and frontal headaches, which increased with the use of the eyes and with increased tension, but also complained of pain in her right hip and shoulder, weakness, blueness,

1. Webster's Third New International Dictionary defines an otolaryngologist as "a specialist in otlaryngology" which is "a branch of medicine that deals with the ear, nose, and throat and their disorders and diseases."

numbness and swelling of her right arm, and dizziness and blackout spells. He examined her and took some x-rays of the cervical and spinal area and the skull, finding it normal, but noted a compression deformity at C 5–6 level, the interspaces, for which he recommended the use of a cervical collar. He again examined plaintiff on June 26, 1968 at which time she was complaining of a tightening across her shoulders and down the mid-back, numbness of her back, right hand, right arm and right leg, worse headaches, increased blurring and double vision. He referred her to an opthalmologist for her visual problems and conducted a cervical discogram, which showed that with relation to numbers five and six there was a disintegration of approximately fifty per cent. He said that once a disc is violated and the normal fluid is lost it dries out and becomes functionless. He recommended the removal of the involved discs and an anterior cervical fusion which was accomplished on February 14, 1968. Plaintiff was hospitalized at that time for three days. Dr. Nilan saw plaintiff on six occasions thereafter, the last time being on December 10, 1968. He felt that she was improving and had made a satisfactory functional recovery.

On April 28, 1969 Dr. Lowell Gess, an opthalmologist at the Quain & Ramstad Clinic in Bismarck, examined plaintiff and found that instead of having esophoria as before, where her eyes turned in, she then had exophoria, where the eyes tend to turn out. She had two prism diopters for distance and eight for near (ten inches from the nose). She had symptoms of blurring, some discomfort when reading, her eyes would tire, and close work troubled her. He examined her again on February 27, 1970, the week before the trial, and found that the exophoria was one and one-half prism diopters for distance and ten for near vision. The doctor said the diplopia, or seeing double was a subjective symptom, i. e., only plaintiff knew whether she experienced it, but that it was a medical probability and consistent with his objective findings and her case history.

Dr. Gess said that secretarial or other close work would be difficult for plaintiff, but that she could avoid double vision at close range by using a patch over one eye, although that would be an unsatisfactory way to live. He recommended that she might be helped by lenses that would be decentered with the bases, which would cost $55.00 or $60.00. If this or exercises did not help, he said that surgery might be performed on one or both eyes but that he could not guarantee success from the operation. Surgery would cost about $300.00 and would require hospitalization from three to five days. He said that her problem, however, would very likely be lasting.

Dr. Thomas Ellingson, an opthalmologist in private practice in Bismarck, examined plaintiff on May 28, 1969 and found that she had exophoria and that she did not complain of double vision at all times, but said that upon reading or spending some time in doing close work her eyes would burn and start getting tired and her vision would get a little blurry and that she would start seeing double if she persisted. Double vision would start if the work were as close as twelve to fourteen inches from her face. He did not think surgery was indicated.

Plaintiff testified that she was involved in another accident on June 21, 1969 when another car skidded into the car in which she was sitting. She stated the car had almost stopped by the time it hit but that it irritated her condition a little bit as it made her neck sore and stiff and she had muscle spasms for a while, but that it did not change her vision difficulties at all and she made no claim for those injuries. She was involved in another automobile accident in December, 1964 when she skidded into the rear of another car which stopped suddenly, but she described this as a "small accident" as she was driving "very slowly," and said that there were no injuries.

According to the doctors' findings based on what plaintiff told them and

their examinations of her, she did not see double unless she was reading or doing needle work within ten to sixteen inches from her eyes. Of the two doctors who examined her in 1969 and 1970, one said ten inches and the other twelve to fourteen inches. At the trial, however, plaintiff testified that when looking at a small object, such as a pencil, she would see double at three feet.

Plaintiff was a high school graduate and attended college for three quarters. She did not take any business courses in college but said that her mother was an accountant and bookkeeper and taught her to type when she was twelve and to keep books and use business machines at the age of fifteen. She worked as a waitress the short time she was in college to help defray her expenses and worked for Ketchikan Cold Storage for four months before she entered college where she was taught how to do payroll reports. She worked as a fry cook and waitress for about a month at the train depot in Spokane and then moved to North Dakota where she worked about three or four months at the Tempo Discount Center. She was asked to resign from this position. In 1966, after the accident, she worked several months as a waitress in Boise, Idaho, and a couple of months in 1967 at a drug store in Alaska. Plaintiff testified that from time to time she helped her father keep his books. Her longest and most recent employment was as general office help for Precision Automotive Service and S & S Enterprises. She began working in October, 1967 and worked for approximately six months answering the telephone, writing tickets, making bank deposits, etc. She said that she felt more secure working as a waitress but if she were able to see properly she could be a secretary or a clerk in an office. Although plaintiff can type, she does not take shorthand. She and her husband were divorced in 1967 and at the date of trial she was not working but living on $135.-00 in child support which her husband pays every month. She and the children were living with her parents in a trailer belonging to her brother who was in the Army.

After the accident plaintiff obtained a driver's license in 1967 in Ketchikan which was restricted to her wearing glasses, and she later obtained a driver's license in Fayetteville, North Carolina, also similarly restricted. Such restriction is usual and normal for one who wears glasses and is nearsighted.

■■■ The substantive law of North Dakota is controlling since the alleged tort was committed in that state. Burger Chef Systems, Inc. v. Govro, 407 F.2d 921, 923 (8th Cir. 1969); Schultz & Lindsay Const. Co. v. Erickson, 352 F.2d 425, 429 (8th Cir. 1965). The North Dakota courts and the federal courts apply substantially the same standard in determining the sufficiency of the evidence. Schultz & Lindsay Const. Co. v. Erickson, *supra*, and in either jurisdiction evidence must be viewed in the light most favorable to the verdict. Burger Chef Systems, Inc. v. Govro, *supra*; Serbousek v. Stockman Motors, Inc., 106 N.W.2d 879, 881 (N.D.1961).

■ Whether excessive damages have been awarded under the influence of passion and prejudice, and if so whether the ends of justice will be served by ordering a reduction of the verdict, or whether a new trial must be had, are primary questions for the trial court. The function of the reviewing court in such cases is limited to a determination of whether the trial court abused its discretion in making the determination which it did, thereby effecting an injustice. Neidhardt v. Siverts, 103 N.W.2d 97, 100 (N.D.1960); Halverson v. Zimmerman, 56 N.D. 607, 218 N.W. 862, 863 (N.D.1928). To the same effect, see Lake v. Neubauer, 87 N.W.2d 888, 892 (N.D.1958); Emery v. Midwest Motor Express, 54 N.W.2d 817, 823 (N.D. 1952).

We have heretofore mentioned Professor Moore's comment on this circuit's reluctance to reduce or reverse verdicts for excessiveness, but a discussion of our older cases and an elaboration on

our standard in this circuit was made by Judge Blackmun in Solomon Dehydrating· Co. v. Guyton, 294 F.2d 439, 447–448 (8th Cir. 1961), cert. denied, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961). Judge Blackmun reiterated our position but pointed out that we would continue to review cases of excessive verdicts, not routinely and in every case, but only in those situations where we are pressed to conclude there is a "plain injustice" or a "monstrous" or "shocking" result. Since *Solomon* we have consistently adhered to the view expressed in that case that we can no longer refuse to review the excessiveness of a verdict under all circumstances. See St. Paul Fire & Marine Ins. Co. v. Arkla Chemical Corp., 435 F.2d 857, 859 (8th Cir. 1971); Burger Chef Systems, Inc. v. Govro, *supra*; Century "21" Shows v. Owens, 400 F.2d 603, 612 (8th Cir. 1968); Lowery v. Clouse, 348 F.2d 252, 255 (8th Cir. 1965); Bankers Life & Cas. Co. v. Kirtley, 307 F.2d 418, 423 (8th Cir. 1962); Nat'l Food Stores, Inc. v. Utley, 303 F. 2d 284, 286 (8th Cir. 1962).

 It is important in diversity cases that the damages awarded by a federal court jury shall not exceed those which could be sustained where the case is before the supreme court of that state. Bankers Life & Cas. Co. v. Kirtley, *supra*. No North Dakota case has been cited to us and we have not found any where an award anywhere near the amount here was given for similar injuries. For example, in a recent North Dakota case involving an injury which caused a seventeen-year old boy to lose one of his eyes the jury returned a verdict of $27,000.00, and the North Dakota Supreme Court held that the verdict was not excessive. Holten v. Amsden, 161 N.W.2d 478 (N.D.1968). In Lake v. Neubauer, *supra*, another North Dakota case, the jury awarded $9,000.00 in dam-

ages where the injury consisted of a blow on the forehead and injury to the neck, vertebrae and knee, causing severe pains which were likely to continue, and the award was held not to be excessive. Plaintiff cites our case of Parke-Davis & Co. v. Stromsodt, 411 F.2d 1390 (8th Cir. 1969), where the verdict was $500,000.00, but its excessiveness was not challenged and was not an issue before us, and, of course, the injuries sustained in the present case cannot approach equation with those in the *Stromsodt* case. In any event, a comparison of verdicts in other cases is of limited value as each case must rest on its own peculiar facts. See Century "21" Shows v. Owens, *supra*, 400 F.2d at 611.

It is suggested that the prominence of defendant may have influenced the jury to award such a large verdict. Mrs. Bertsch was at the time of the accident Mrs. Schafer, having been divorced from Harold Schafer, a recent candidate for Governor of North Dakota and Chairman of the Board of Gold Seal Company. She was National Committeewoman for the Republican Party for the State of North Dakota. During the course of the trial Mrs. Bertsch was referred to several times as Mrs. Schafer, but the trial court found this was not prejudicial.

We have attempted to set forth the plaintiff's injuries in the most favorable light as we should do, but in summarizing it is obvious that her principal injury was to her near eyesight which caused her to see double when she was doing close work such as knitting, crocheting, reading, etc. Dr. Ellingson testified that when he examined her on May 28, 1969 she would see double if she held anything closer than twelve inches but beyond twelve inches she had no problem.[2] This expert also testified

2. "Q. But on your tests, when you ran them. A. Oh, on my tests. Yes, she would start to see double if you held anything closer than 12 inches.

"Q. Twelve inches? A. Twelve inches, yes, sir.
"Q. Beyond 12 inches, was there a problem? A. No."

that plaintiff could see well enough to reasonably perform any type work.[3]

Dr. Gess, who examined plaintiff on April 28, 1969 and again on February 27, 1970, testified that she had symptoms of blurring and discomfort when reading, that her eyes would tire and close work troubled her but that his other findings were within normal limits. He said it would be difficult for her to do secretarial work or work of the nature where you have to read and work at close distances. He felt she could be helped by lenses that would be decentered with the bases in and that was his recommendation for the time being. Plaintiff had not, however, obtained the corrected lenses at the date of trial, but was still wearing glasses prescribed for her fifteen months earlier. Neither had she tried the exercises nor had the surgery performed which he suggested.

Dr. Perrin, who specialized in a practice limited to eye, ear, nose and throat, testified that plaintiff's distance vision was within normal limits and that she could obtain a pilot's license. Upon two examinations of plaintiff, he found her vision abnormal for close vision of sixteen inches.

Dr. Nilan, an orthopedic surgeon who operated on plaintiff more than two years after the accident in Bismarck, testified that she made a satisfactory functional recovery from her back injury.

Dr. Orien, an otolaryngologist, and the last physician at the Clinic to examine plaintiff before she left Bismarck, testified that his associate, Dr. Peterson, initially diagnosed plaintiff as having "multiple contusions, mild," meaning that she had numerous bruises, but the doctor did not feel that they were particularly serious at the time. Dr. Orien testified that from Dr. Peterson's report it would be a fair statement to say that Dr. Peterson found no bruises or marks on plaintiff's back following the accident. Dr. Orien stated in a report which he prepared on January 19, 1966 that the patient had made a complete recovery.

Plaintiff testified that her back injury was not suspected until almost two years after the accident.[4]

We have the utmost respect for the trial court but conclude that the evidence does not warrant its findings and that the court abused its discretion. The verdict, if allowed to stand, would be a plain injustice and, in the language used in *Solomon*, "monstrous" and productive of a "shocking result."

---

3. "Q. All right. Would this five-diopter exophoria, plus the diminished amplitude of fusion, plus the diminished near point of convergence, make, in your opinion, based on reasonable medical certainty, Mrs. Perry physically unable to perform the duties, for example, of a waitress? A. Absolutely not.

"Q. Of a sales clerk in a department store, from your knowledge of what—A. She would be able to do that.

"Q. Of a receptionist in an office? A. She should be able to do that.

"Q. How about bookkeeping and posting of journal entries and working with receipts and sales tickets, and all that? A. It's conceivable that any individual with these findings as you have described, with proper glasses and proper prisms, should be able to even perform reasonably well at that.

"Q. Well enough to hold a job? A. Should be able to perform reasonably well at that."

4. "Q. And, actually, the surgery was in what's called the cervical spine or the neck area? A. The bottom part of the cervical spine, yes, which is just above the thoracic area, which is—it's not in this part of the neck; it's down a little bit.

"Q. And that was first diagnosed from 26 to 27 months after the accident? A. It was diagnosed a little bit sooner than that. It was suspected, I should say, a little bit sooner than that. I had stated before that I thought I had seen Dr. Nilan in November, and in talking to my sister, she said I went down the first time the end of September.

"Q. So it's almost two years then before you consulted Dr. Nilan? A. Almost two years after the accident that I started suspecting."

The verdict is so excessive as to shock our conscience, and we conclude that the ends of justice will best be served by the district court's setting aside the judgment. We, therefore, reverse and remand this case for a new trial.