239 So.2d 456 (1970)
Joy MOGABGAB, wife of/and Dr. William J. Mogabgab
v.
ORLEANS PARISH SCHOOL BOARD, Robert E. O'Neil, Sam A. Mondello, Estelle Barkemeyer, Jack Pizzano, Dr. Carl J. Dolce, and Continental Casualty Company.
No. 3881.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1970.
Rehearing Denied October 5, 1970.
Writ Refused November 25, 1970.
*457 Ivor A. Trapolin, New Orleans, Jack Peebles, Metairie, for plaintiffs-appellants.
Polack, Rosenberg & Rittenberg, Samuel I. Rosenberg and Franklin V. Endom, Jr., New Orleans, for Orleans Parish School Board, Robert E. O'Neil, Sam A. Mondello, Estelle Barkemeyer and Dr. Carl J. Dolce, defendants-appellees.
S. Roccaforte, New Orleans, for Succession of Jack Pizzano, defendant-appellee.
Before SAMUEL, LeSUEUR and SWIFT, JJ.
LeSUEUR, Judge.
The plaintiffs, Joy Mogabgab and her husband, Dr. William J. Mogabgab, filed this suit against the defendants, Orleans Parish School Board, Robert E. O'Neil, head coach at Benjamin Franklin Senior High School, Sam A. Mondello, assistant coach, Estelle Barkemeyer, principal of the school, Dr. Carl J. Dolce, superintendent of Orleans Parish School Board, Jack Pizzano, supervisor of Health, Safety and Physical Education Division of Instruction of Orleans Parish School System, and Continental Casualty Company. Plaintiffs sued to recover a judgment in favor of Mrs. Joy Mogabgab in the amount of $55,000.00, and in favor of Dr. William J. Mogabgab in the amount of $56,634.75, together with a judgment against Continental Casualty Company for $1,693.50, a penalty of 12% on the total claim, and attorneys' fees and costs, which they assert are the damages incurred by the death of their son, Robert, and which they allege resulted from the negligence of the defendants in failing to perform their duty of providing all necessary and reasonable safeguards to prevent accidents, injuries and sickness of the football players at Benjamin Franklin Senior High School, and, also, in failing to provide for prompt treatment when injuries or sickness occur. Plaintiffs further allege that the defendants did not follow the recommendations of the American Medical Association for the prevention of heat stroke and heat exhaustion during football workouts, which they assert was the cause of Robert's suffering a heat stroke or that it at least contributed thereto. Plaintiffs aver that the first symptoms of illness appeared at approximately 5:20 o'clock p. m. on August 16, 1966, and that Robert became unconscious at 5:25 o'clock p. m., after which, plaintiffs allege, improper treatment was administered which contributed or caused deterioration of Robert's condition to such an extent that proper medical treatment was of no avail and death occurred. Plaintiffs further assert that not until 6:45 o'clock p. m. was Mrs. Mogabgab notified of her son's condition and that it was she who notified Dr. J. H. Phillips, who could not be reached until 7:00 o'clock p. m., and it was not until 7:15 o'clock p. m. that Dr. Phillips arrived at the school. After noting Robert's condition, he rushed the boy to Baptist Hospital, arriving there at approximately 7:30 o'clock p. m., where Robert received medical treatment, but because of the delay and improper treatment administered by the defendant coaches, Robert died on August 17, 1966, at 2:30 o'clock a. m., from a heat stroke. Plaintiffs further allege that Estelle Barkemeyer, Dr. Carl J. Dolce and Jack Pizzano were negligent in failing to supervise properly and make certain that football squad workouts at Benjamin *458 Franklin were properly conducted, in failing to see that proper equipment was used and that the coaches were properly trained, and in failing to see that arrangements were made for injured or sick players to be properly cared for.
The defendants answered and denied the allegations of negligence. Defendants admitted that the first signs of illness exhibited by Robert occurred at approximately 5:20 o'clock p. m. on August 16, 1966, when, during the course of football practice, he staggered and became faint, and that Mrs. Mogabgab was not called until approximately 6:30 o'clock p. m., after which she telephoned Dr. John H. Phillips, who arrived at the school at 7:15 o'clock p. m. Defendants further assert that salt tablets and a drinking fountain were available during the workout session, adequate rest periods were provided, and that at the first signs of fatigue, Coach Mondello removed Robert from the workout and sent him to the school bus. Defendants further assert that the boy's skin was cool and damp to the touch at all times, and that he was not unconscious during the ride from Audubon Park, where the practice was held, to Franklin Senior High School, but that he did vomit, and when the bus arrived at the school, at approximately 5:40 o'clock p. m., Robert was assisted into the school, placed on a blanket on the floor, his clothing removed, and immediately he was given a shower with water at room temperature and then covered with a blanket, after which an unsuccessful attempt was made to have him drink salt water. Defendants further assert that not until 6:25 o'clock p. m. was it apparent medical assistance was needed, and that it was then the coaches telephoned the boy's home to determine his parents preference of a physician. Defendants further assert that the first aid administered by them was proper for mild heat exhaustion, which frequently occurs during opening days of football practice. Dr. Dolce and Jack Pizzano alleged that they were completely unaware of the events surrounding the illness and death of Robert, and are not guilty of any acts of negligence contributing to his death. Mrs. Estelle Barkemeyer alleged that she was on vacation on August 16, 1966, and, therefore, was not guilty of any negligence. The defendants plead the contributory negligence of the plaintiffs in permitting their son to play football when they knew, or should have known, he had periodic increases in blood pressure and abnormal heart sounds, and that they assumed the risk.
During the course of the suit, Jack Pizzano died and his wife, Inez C. Pizzano, executrix of his succession, was substituted as defendant in his place.
Following a trial on the merits, the lower court rendered judgment in favor of the defendants, dismissing the plaintiffs' suit, at their cost. From that judgment, the plaintiffs have perfected this appeal.
The record discloses that Robert Mogabgab was on the football squad of Benjamin Franklin Senior High School, and on August 16, 1966, he was engaged in training exercises, the second day of practice for that school year. The coaches, Robert E. O'Neil and Sam A. Mondello, were supervising the practice, which began at 3:45 o'clock p. m. at Audubon Park in New Orleans. At approximately 5:20 o'clock p. m., while participating in an exercise known as "wind sprints", Robert displayed fatigue and fell down, after which he was assisted to the school bus by two of his teammates. He was nauseous and vomited prior to entering the bus and while en route to Benjamin Franklin Senior High School.
Robert Wissner, a teammate, testified that young Mogabgab appeared to collapse when climbing the steps of the bus and that he had to be carried onto the bus. Wayne Webb, a former student and football player at Benjamin Franklin, testified that Robert fell during the wind springs and, within a minute or two, two boys carried him to the bus, with his feet on the ground, but that he was put into the bus, and the boys had difficulty getting him up the steps of the bus. Wayne Webb further testified that *459 while seated on the front seat of the bus Robert seemed to "lose himself". He estimated that the bus arrived at the school about 5:40 o'clock p. m., that Robert was helped into the school building, where he was placed on the cafeteria floor on a blanket, and the other players began undressing him. He described Robert's appearance as pale, tired and exhausted. He did not observe Robert talking at any time. He further testified that Robert was later placed in the shower, was taken out about 5:50 o'clock p. m., placed on a blanket, with a blanket over him, and he was given an ammonia capsule by Coach Mondello. By this time, he was very clammy, pale, his breathing was heavy, and he was concerned about Robert's condition. Robert's arms were massaged and an unsuccessful attempt was made to give him salt water. Wayne Webb further stated that Coach O'Neil was in the office most of the time while Robert was receiving the aforedescribed treatment, that a first aid book was brought into the cafeteria, and that both of the coaches discussed what was wrong and what should be done.
Dr. Howard W. Wissner, professor of industrial relations at Tulane University, and his wife, parents of Robert Wissner, arrived at the school at approximately 6:40 o'clock p. m., and observed Robert lying on the cafeteria floor. They described Robert as appearing grayish-blue, with his mouth hanging slightly ajar, his lips and the exposed hand and arm were bluish, and he was moaning. Dr. Wissner stated to Coach Mondello that Robert was critical and apparently in shock, and that a physician should be called; that when he offered to call a physician, Coach Mondello told him "no", and explained that Dr. Rinker, a member of the school board, would see that a doctor in the neighborhood would come quickly, if he were called, and that he would take care of it. Dr. Wissner stated that he observed two first aid journals where Coach Mondello was seated. Mrs. Wissner informed her husband that something must be done for Robert, after which Dr. Wissner reiterated his earlier statement, that if the coach did not call a physician, he would. At this point, Coach Mondello again stated that it was his responsibility, and, as Dr. Wissner was leaving the school to call a physician, Coach O'Neil called to him and stated that Robert's father was a physician and that his mother had indicated she would call Dr. Burch.
Mrs. Mogabgab was telephoned at approximately 6:45 o'clock p. m. She then called Dr. John H. Phillips, who arrived at the school at approximately 7:15 o'clock p. m.
Dr. Phillips, a specialist in internal medicine and a subspecialist in cardiovascular diseases, was Robert's treating physician. He testified that he first saw Robert on April 16, 1962, and again on May 10, 1966, and on both occasions he found his health to be perfectly normal. Dr. Phillips explained that periodic rises in blood pressure and a heart murmur he detected were normal. He testified the next time he saw Robert was on August 16, 1966, at approximately 7:15 o'clock p. m., in response to a call from Mrs. Mogabgab about 7:00 o'clock p. m. He stated that when he saw Robert he was lying on the cafeteria floor on a blanket, on his abdomen, in an obviously sick condition; that he was unconscious, cyanotic, cool, clammy, actively sweating, with no pulse in any of his major vessels, no evidence of pressure, pupils were widely dilated, fixed, and not responsive to light, and, at that time, he diagnosed the condition as profound heat exhaustion with shock to an advanced degree, but not necessarily irreversible. He stated that he immediately had the boy transferred to Southern Baptist Hospital, where they met Dr. Robert Burch, a specialist in internal medicine with a subspeciality in diseases of the kidneys and electrolyte fluid, whom he had called. In the hospital, Robert's condition was diagnosed as heat stroke. Vomitus was removed from Robert's mouth and a tracheotomy performed to provide an airway, saline solution was administered intravenously, and an ice mattress *460 was used to lower his temperature. Robert was seen by numerous physicians, including Dr. Maurice Pearl and Dr. George Burch, a leading specialist in internal medicine and problems associated with body heat, who has published numerous articles and books on the subject. Dr. Phillips testified that Robert's condition continued to worsen and, at 2:30 o'clock a. m. on August 17, 1966, he expired.
Dr. George Burch testified that he examined Robert around 8:00 o'clock p. m., at which time he found him seriously ill and in coma, and, in his opinion, the prognosis was poor. He explained heat exhaustion and heat stroke and stated that when a person is unable to walk his condition is "pretty severe" and medical advice should be sought, so that medical treatment can be instituted before the patient's condition reaches an irreversible state. Dr. Burch pointed out that every effort should be made immediately to stop accumulation of heat and putting a blanket over a person with heat exhaustion or heat stroke is the wrong thing to do. He further explained that it is extremely important that such a patient be brought to a physician and hospital, since the quicker treatment is begun to reverse the condition caused by heat stress the better the prognosis; therefore, time is of the essence. Although Dr. Burch could not give a positive answer that Robert would not have died if proper medical treatment had been instituted when he first staggered and informed the coach of his illness, he did state that his death would have been much more unlikely.
The trial court dismissed the action without written reasons. It seems clear, however, that the dismissal was predicated upon the trial judge's assessment and evaluation of the burden of proof of causality, a burden which, in the main, must be borne by the plaintiff in a civil action.
Certainly it is plain that Robert E. O'Neil and Sam A. Mondello were negligent in denying the boy medical assistance and in plying an ill-chosen first aid. Moreover, the facts concerning the question of causality are at least reasonably clear. It is the legal significance of these facts that fashions the hub of the case.
The best synthesis of the medical evidence is that heat damage works its wreckage upon the body in a continuum, causing progressive internal changes in the human system much as it causes progressive organic changes in a boiling egg. At some indefinite point in this continuum the process of heat damage becomes irreversible and past that point little can be done. All of this means that if appropriate medical assistance is available early, the chances of survival are good. If it is long delayed, there is little hope. Once symptoms appear each minute that passes without medical attention measurably reduces the chances of survival. All of the medical evidence, save that of Dr. Nadler (who played no part in treatment) both supports and reinforces these conclusions.
Here, the negligence of Coaches O'Neil and Mondello actively denied Robert access to treatment for some two hours after symptoms appeared. When he did see a physician, it was too late and he died. This much the plaintiffs proved.
It was not proved that he would have certainly lived if brought to a doctor sooner or for what precise period of time the condition remained reversible. We do not think, however, that the law demands such flawless precision. Casualty like most other facts in a civil action, may be proved by a preponderance of the relevant evidence. Stripped of unfortunate jargon concerning certainty, proof by a preponderance of evidence requires only that a litigant satisfy the court or jury by sufficient evidence that the existence of a fact is more probable or likely than its nonexistence. See Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963), and Sanders, Anatomy of Proof in Civil Actions, 28 La.L.Rev. 297.
Taken as a whole, the record supports the premise that it is more likely than not *461 that Robert would have survived with reasonably prompt medical attention. Here the testimony of Dr. Robert Burch is relevant:
"Q. Is it possible for you and/or any other physician to say with any degree of certainty if your treatment had begun, say, fifteen minutes sooner that you could positively have saved Robert's life?
"A. I couldn't say positively but I think it's an unquestionable fact that the sooner treatment has begun the more likely recovery would take place.
"Q. Why certainly, no question. But you cannot say with any degree of certainty that his life could have been saved?
"A. Not absolutely, no.
"Q. Suppose I made that thirty minutes sooner, aren't you in that same position, you can't say with any certainty that his life would have been saved?
"A. I think (if) we found him thirty minutes sooner suffering from heat exhaustion I would say it would be unlikely that he would have died."
The testimony of Drs. George Burch and John Phillips is much the same.
The record will not support a charge of negligence on the part of Estelle Barkemeyer, Jack Pizzano and Dr. Carl J. Dolce. The claim against Continental Casualty Company is no longer before the court on appeal.
The next issue for our determination is the quantum to be awarded. Robert was 16 years of age at the time of his death. He was very mature, well rounded and intellectually superior. He was active in scouting, enjoyed sports, and, since he was the eldest child, he assisted his parents with the younger children in the family.
The parents, of course, would not have traded nor could one have purchased the love and companionship of this exceptional and promising child for any amount of money. However, it is the task of this court to arrive at a figure for damages because of the wrong done these parents by the defendants' negligence. It is our opinion that an award of $20,000.00 to each parent for the wrongful death of their son is a just amount. Additionally, the father is entitled to an award of $941.25 for funeral expenses and $693.50 for medical expenses.
For the foregoing reasons, the judgment of the lower court is hereby affirmed, insofar as it dismissed the plaintiffs' suit against Mrs. Estelle Barkemeyer, Dr. Carl J. Dolce and Mrs. Inez C. Pizzano, executrix of the Succession of Jack Pizzano. The judgment is reversed insofar as it dismissed the plaintiffs' suit against the Orleans Parish School Board, Robert E. O'Neil and Sam A. Mondello; and judgment is hereby rendered in favor of plaintiff, Mrs. Joy Mogabgab, in the sum of $20,000.00, in favor of plaintiff, Dr. William J. Mogabgab, in the amount of $21,634.75, and against the defendants, Orleans Parish School Board, Robert E. O'Neil and Sam A. Mondello, jointly and in solido. The award of penalties and attorneys' fees are denied. The defendants-appellees are to pay all costs of the proceedings.
Affirmed in part; reversed in part; and rendered.