**Patricia STINEMAN, Appellee,**

v.

**FONTBONNE COLLEGE and Mary Jo Lopiccolo, Appellants.**

**No. 80–1876.**

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1981.

Decided Nov. 24, 1981.

On Motion to Clarify Dec. 24, 1981.

W. Munro Roberts, Jr. (argued), Ted L. Perryman, St. Louis, Mo., for appellant Fontbonne College.

Shepherd, Sandberg & Phoenix, A Professional Corp., John S. Sandberg (argued), Reed W. Sugg, St. Louis, Mo., for appellee Patricia Stineman; Philip H. Corboy & Associates, Philip H. Corboy, Chicago, Ill., of counsel.

Before HEANEY and HENLEY, Circuit Judges, and NICHOL,* Senior District Judge.

HEANEY, Circuit Judge.

Defendant Fontbonne College appeals from a jury verdict finding it negligent in failing to provide medical assistance to plaintiff Patricia Stineman. The trial jury awarded Stineman damages of $800,000 for loss of vision in one eye. We affirm the judgment below with respect to Fontbonne's liability, but find that the damage award is excessive and not supported by the evidence. Unless the plaintiff files a remittitur in accordance with this opinion, a new trial will be granted on the question of damages.

---

* The Honorable FRED J. NICHOL, Senior District Judge, for the District of South Dakota, sitting by designation.

## I.

### FACTS

Stineman has been deaf since infancy and must rely upon lipreading to communicate. At the time of her injury in 1976, she was a freshman at Fontbonne College where she played on the school's intercollegiate softball team. Fontbonne was aware of her deafness and, as with all of its students, required Stineman and her parents to sign authorizations for emergency medical treatment. The three softball coaches were also aware of Stineman's deafness: Shirley Greenspan, the Athletic Director, Jim Johnson, a paid student coach, and Everett Brake, the College's Director of Buildings.

Stineman was injured during softball practice when a ball, thrown by defendant Mary Jo Lopiccolo, struck her in the right eye. The impact of the ball striking Stineman could be heard eighty to one hundred yards away, according to the testimony of other players in the outfield. Coach Johnson heard Stineman cry out from the impact. Ice was applied to the area of the eye, and Coach Brake told Stineman to go to her dormitory room and rest, and that she would be all right. Neither coach directed or suggested that Stineman should see a doctor, although both were aware that the ball's impact was quite hard and that Stineman was especially dependent upon her eyesight.

Athletic Director Greenspan was not present during the practice but was told of the injury later the same day. She did not attempt to contact Stineman, examine the injury or suggest that Stineman visit a doctor. Greenspan testified, however, that she was certified to teach first aid, that she knew loss of vision can result from a blunt injury to the eye, and that if she had observed someone being hit in the eye with a softball, she would take the person to a doctor.

Following the injury, Stineman returned to her dormitory room where she remained that evening and the next day. She testified that she was under the impression she would be all right because none of the coaches said anything to indicate something could be wrong. The next evening, she went to a dance, and on the following day, she began experiencing dizziness and severe blurring and coloring of her vision. She returned to the home of a friend and arranged to have her parents telephoned. Her parents directed her to an internist who observed blood in the anterior chamber of the eye. Realizing that Stineman had a serious injury, the internist immediately referred her to an ophthalmologist, Dr. Thomas Eggleston.

Dr. Eggleston's examination revealed a dilated, irregular pupil which he testified occurred at the time of the injury. He also saw blood in the anterior chamber of the eye, a condition called hyphema. Traumatic hyphema is a relatively common injury. Treatment for it consists of prompt immobilization of the eye and absolute bed rest, the aim of which is to reduce the chance of secondary hemorrhage. According to the expert testimony, when such treatment is given before rebleeding, there is a ninety percent or greater success rate. It was a secondary hemorrhage, or rebleeding, that Stineman experienced two days after she was struck by the ball.[1]

Dr. Eggleston hospitalized Stineman and attempted to drain the eye. This proved temporarily successful, but two days later, the eye again began to bleed, an infection developed and Stineman completely lost the vision in the eye. The eye began to shrink in the socket and she was fitted with a prosthesis.

Stineman filed suit against Fontbonne College and Lopiccolo. The trial jury found no liability on the part of defendant Lopiccolo, but returned a verdict against Fontbonne in the amount of $800,000 for its

---

1. According to the expert witnesses, when the eye is first injured, its blood vessels tend to "snap back" and stop the bleeding. Immediate and total immobilization for up to five days is designed to allow clotting to occur, after which full healing normally ensues. Because of the aqueous character of the eye's interior, such clotting is slow to form and if the clot is displaced, rebleeding becomes very difficult to control.

failure to provide Stineman with medical assistance. The district court[2] denied Fontbonne's motion for judgment n.o.v., and its alternative motions for remittitur or a new trial.

## II.

## LIABILITY

■ Fontbonne contends that, as a matter of law, it owed no duty to provide medical assistance and, therefore, should have been granted a directed verdict or judgment n.o.v. We note that courts have generally found such a duty in similar circumstances. *See, e.g., O'Brien v. Township High School Dist.*, 73 Ill.App.3d 618, 29 Ill. Dec. 918, 392 N.E.2d 615 (Ill.App.1979); *Mogabgab v. Orleans Parish School Board*, 239 So.2d 456 (La.App.1970); *Welch v. Dunsmuir Joint Union High School Dist.*, 326 P.2d 633 (Cal.App.1958). Fontbonne contends, however, that it owed no duty to render medical assistance in this particular case, relying principally on *Kersey v. Harbin*, 531 S.W.2d 76 (Mo.App.1975), a Missouri state court decision setting forth certain elements necessary to imposing such a duty. Although it is arguable whether *Kersey* controls the present case,[3] we need not reach that issue because we find that the elements in *Kersey* are satisfied here. To find a duty to render medical assistance, the first element under *Kersey* requires that the defendant must have been able to appreciate the severity of plaintiff's injury. Here, both coaches who were present knew that the ball made a tremendous impact when it struck Stineman, that it struck her in the area of the eye and that she was dependent upon her eyesight to communicate. Further, Coach Greenspan was made aware of the injury the same day, knew of the risks associated with such injuries and knew of Stineman's special dependence on her eyes. Based on these facts, Fontbonne should have appreciated the severity of Stineman's injury.

The second element of *Kersey* requires a determination that one or more of the defendants had the skill to provide adequate medical treatment. The only treatment required here was to get the injured person to a doctor. All of the coaches knew that the school's medical clinic was across the street from the softball field. The defendants certainly had the skill to provide this much treatment.[4]

The third element of *Kersey* addresses whether providing medical attention would have avoided the injury's ultimate harm. *Kersey* involved avoiding death, but the question here is avoiding loss of vision. The record establishes that if Stineman had received prompt medical attention, there was a substantial likelihood the eye would have healed with no loss of vision. The expert testimony established that when treatment is obtained before rebleeding, successful healing occurs in ninety to ninety-eight percent of the cases.

We thus find that Fontbonne had a duty to provide medical assistance and that there was sufficient evidence to submit to the jury questions of whether Fontbonne breached this duty and whether such breach caused the loss of vision.

■ Fontbonne also argues that the trial court's instruction on negligence[5] was

---

2. The Honorable Harris Kenneth Wangelin, Chief United States District Judge for the Eastern and Western Districts of Missouri.

3. The opinion in *Kersey v. Harbin*, 531 S.W.2d 76 (Mo.App.1975), was for the most part concerned with a failure to supervise a class of eighth graders, not a failure to render medical assistance. Moreover, the court applied a strict standard against recovery because the defendants in that case were or could be immune or privileged—a standard that was later criticized. *See Kersey v. Harbin*, 591 S.W.2d 745, 747 (Mo.1979).

4. We need not decide how much of an effort must have been made to obtain medical attention when, as here, no attempt was made to even suggest such attention.

5. The negligence instruction provided:
   Your verdict must be for the plaintiff, Patty Stineman, and against the defendant Fontbonne College, if you believe, First: Defendant failed to render medical assistance when it knew or in the exercise of ordinary care should have known that the failure to do so would cause permanent injury to Patty Stineman, or that the defendant's conduct as sub-

incorrect because it did not specifically set forth the elements of *Kersey v. Harbin, supra.* A party is not entitled, however, to have the jury instructed in any particular language, so long as the jurors understand the issues and are not misled. *McCamley v. Shockey,* 636 F.2d 256 (8th Cir. 1981); *Frosty Land Foods v. Refrigerated Transport,* 613 F.2d 1344 (5th Cir. 1980); *Leathers v. United States,* 471 F.2d 856 (8th Cir. 1972). We find that the court's instruction incorporated the elements of *Kersey* and that the jurors were not misled.[6]

Fontbonne next seeks reversal because the district court refused to give a cautionary instruction when the plaintiff withdrew her allegation of improper supervision during the softball practice. Stineman initially sought recovery on two theories: failure to properly supervise the softball practice, and failure to provide medical assistance. Although Stineman abandoned the theory of failure to supervise, the jury was not specifically instructed to disregard it. Fontbonne argues that the evidence relating to supervision was irrelevant to the remaining issues and was so prejudicial that, absent a cautionary instruction, a new trial must be granted.

■ Fontbonne specifically claims prejudice from evidence that there was more than one ball in play; that the coaches did not give special instructions to the other players about throwing the ball to Stineman; that Athletic Director Greenspan was not present at the softball practice; and that Coach Johnson may not have been competent in conducting the practice. This evidence generally would have been admissible, however, even if the plaintiff had not alleged a failure to supervise. The number of balls in play came before the jury largely as background evidence establishing how the injury occurred during softball practice. Evidence of special instructions regarding throwing the ball to Stineman, or the lack of such instructions, would be admissible because of the negligence claim against defendant Lopiccolo. The evidence of Greenspan's absence simply established that she was the athletic director, a team coach and not a witness. This related to her possible role in rendering medical assistance upon hearing of the injury. The evidence questioning Coach Johnson's competence was largely directed at his failing to render medical assistance. Thus, it is difficult to find unfair prejudice from evidence that generally would have been admissible on the theories which were submitted to the jury.

■ Moreover, the jury instructions clearly set out that the legal standard is failure to render medical assistance, not failure to supervise. All counsel in closing arguments addressed this fact. Whether to give a cautionary instruction is within the discretion of the trial court. *See Simineo v. School Dist. No. 16 Park Cty., Wyo.,* 594 F.2d 1353 (10th Cir. 1979); *Krieger v. Bausch,* 377 F.2d 398 (10th Cir. 1967). Although the better practice is to advise the jury that a theory has been withdrawn, we cannot say that the failure to do so here constitutes reversible error.

■ Fontbonne also seeks reversal because the trial court did not submit written instructions to the jury. Missouri law requires that instructions be given in writing to the jury, but a federal court is not bound by such procedural rules. *See, e.g., Wright v. Farmers Co-Op of Arkansas and Oklahoma,* 620 F.2d 694 (8th Cir. 1980). Whether to give instructions in written form is discretionary with the trial court. *United*

mitted was negligent, and, Third [sic]: As a direct result of such negligence, Patty Stineman sustained damages. The burden is on the plaintiff in connection with that instruction.

**6.** The first element of *Kersey* (appreciation of the injury) was incorporated by requiring the jury to find that Fontbonne "knew * * * or should have known" of the consequences of failure to render medical assistance. The second element of *Kersey* (skill to provide medical treatment) only involved getting the plaintiff to a doctor and was incorporated by requiring the jury to find that the College failed to render medical assistance. The third element of *Kersey* (that had measures been taken, the injury could have been avoided) was incorporated in the third part of the instruction which requires a finding of proximate cause.

*States v. Conley*, 503 F.2d 520 (8th Cir. 1974). The present case was neither a lengthy nor a complicated case, and the instructions were only a few pages. We find no abuse of discretion.

Fontbonne next alleges that a mistrial should have been granted after Stineman cried in response to questions by her counsel. The transcript reveals the following:

Q: Are you afraid of losing sight in your other eye, Patty?

A: Yes.

Q: How does that effect you?

A: If I lose it, it would be hard.

Q: You wouldn't be able to talk if you—that's all right.

At this point, Stineman began to cry. Her counsel requested and was granted a recess until the following day. Fontbonne moved for a mistrial.

■ We note that Stineman's injury is permanent and is more severe because her deafness forces reliance upon her eyesight in order to communicate. The questions by her counsel were proper when viewed from the perspective of establishing the permanent effects of her injury. We do not feel that they were deliberately designed to elicit such a response from Stineman. In another trial, the same thing may well recur. Although this incident may have affected the jury's determination as to the amount of damages, it does not follow that Fontbonne was unfairly prejudiced on the issue of its duty to render medical assistance. Moreover, determining the prejudicial effects of specific witness behavior is a matter within the discretion of the trial court. We cannot find that refusing to grant a mistrial on this ground was an abuse of discretion.

Having rejected Fontbonne's contentions on each of the foregoing issues, the jury's determination of liability must be affirmed.

## III.

### DAMAGES

■ Fontbonne asserts that the district court erred in refusing to allow Fontbonne to inform the jury that Stineman only sought damages of $300,000 in her complaint. The transcript reveals, however, that during closing argument, counsel for Fontbonne did indeed inform the jury that Stineman was seeking $300,000. In this light, we can find no reversible error on the part of the district court.

■ Fontbonne also attempts to characterize the plaintiff's prayer for relief as an admission binding against her. We find no merit in this contention. Rule 54(c) of the Federal Rules of Civil Procedure states that all judgments, except those by default, "shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief* in his pleadings." (Emphasis added.) In accordance with this rule, it is not uncommon for an award to be greater than that requested in the prayer for relief; the complaint is subsequently amended. *See, e. g., Morrow v. Greyhound Lines, Inc.*, 541 F.2d 713 (8th Cir. 1976). The cases relied upon by Fontbonne are inapplicable because they involve situations where a party has made a factual admission as to its own conduct which it later attempts to deny at trial. *See, e. g., Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679 (8th Cir. 1966); *Seven-Up Bottling Co. v. The Seven-Up Co.*, 420 F.Supp. 1246 (E.D. Mo.1976). To the extent we hold that Stineman was not bound by the prayer for relief in her complaint, it was not erroneous for the district court to refuse to reduce the award from $800,000 to $300,000.

■ Fontbonne also contends that the jury's award of $800,000 was excessive and not supported by the evidence. We recognize that the determination of excessiveness is, in the first instance, a matter for the trial court and that an appellate court should be hesitant to overturn jury verdicts which include damages for pain and suffering. *See, e. g., Taken Alive v. Litzau*, 551 F.2d 196 (8th Cir. 1977). In the present action, however, the jury award so grossly exceeds the damages proven at trial that it cannot be affirmed.

In a diversity case such as this, we must look to the forum state's case law for guidance on the question of excessiveness. *See Perry v. Bertsch,* 441 F.2d 939 (8th Cir. 1971). Jury awards in Missouri for loss of vision in one eye have not approached the $800,000 awarded here. *See Bine v. Sterling Drugs,* 422 S.W.2d 623 (Mo. 1968) ($175,000 held excessive); *Griffith v. St. Louis-S.F. R.R.,* 559 S.W.2d 278 (Mo. App.1977) ($150,000 deemed adequate). These cases did not involve the compounding effect of deafness, which certainly makes the eye injury more grave. In light of plaintiff's deafness, a jury could properly award an amount greater than the awards in *Bine v. Sterling Drugs, supra,* or *Griffith v. St. Louis-S.F. R.R., supra.* The award here, however, is $650,000 greater than the largest verdict sustained in those cases, a variance that seems excessive on its face.

It might be possible to affirm the $800,-000 award if there was evidence of substantial medical bills or loss of earnings. The record indicates, however, that the total medical bills do not exceed $5,000. The evidence on loss of earnings is difficult to assess. The plaintiff was twenty-three years old at the time of trial and, hence, has forty-two years of projected earnings. She has a college degree and earns $4 per hour as a teacher's aid. Plaintiff's vocational expert testified that the starting salary of elementary school teachers ranges between $9,500 and $14,000, and that the plaintiff, with her multiple handicaps, will have a difficult time finding employment other than her present position. There was no specific estimate, however, of the likely earnings of someone with the plaintiff's skills, education and handicaps. No attempt was made to provide the jury with methods of calculating the present value of an award for loss of earnings, nor for estimating the possible effects of inflation.

Viewing the evidence on economic loss in the light most favorable to the plaintiff and allowing for substantial pain and suffering damages because of the multiple handicaps present here, a total award of $600,000 could be sustained on this record. The award of $800,000, however, seems clearly excessive. It may be due to understandable sympathy for the plaintiff's circumstances and to emotional reaction to her testimony

at trial, *see supra* at p. 1088, but these are not grounds on which we can affirm an award.

It is therefore ordered that the case be remanded to the trial court with the following instructions. If the plaintiff does not file a remittitur of $200,000 within sixty days of this opinion, the jury award will be set aside and a new trial granted on the sole question of damages. If the plaintiff does file such a remittitur, the reduced award of $600,000 shall be satisfied in cash or, at plaintiff's election, by a structured settlement providing for (1) payment of attorney's fees in cash, (2) payment of a portion of the remaining sum to the plaintiff in cash, and (3) purchase by the defendant of an annuity for the plaintiff reflecting the full value of the remaining sum (including in the calculation of such annuity, the maximum value of tax benefits available to the plaintiff by virtue of such alternative settlements). If a remittitur is filed in accordance with the foregoing, the district court shall enter a conforming amended judgment.

NICHOL, Senior District Judge, dissenting.

I concur in this opinion, except as to the question of damages and the remittitur, which the majority opinion would require. As to damages and the required remittitur, I respectfully dissent.

The test, as clearly enunciated by this Court in *Drotzmanns, Inc. v. McGraw-Hill, Inc.,* 500 F.2d 830, 835 (8th Cir. 1974), is whether the verdict "is so grossly excessive as to shock the conscience of [the] court." As the majority opinion points out, it is necessary to look to the case law in the forum state for guidance on the question of excessiveness. *See Perry v. Bertsch,* 441 F.2d 939 (8th Cir. 1971). The *Perry* Court, however, cautions that "the comparison of verdicts in other cases is of limited value as each case must rest on its own peculiar facts." *Id.* at 944. While the majority cites two Missouri cases [1] where the award for the loss of vision in one eye was far less than the $800,000 awarded to Stineman, they totally ignore the 1981 case cited by Stineman where a St. Louis jury returned a verdict in the amount of $1,000,067 for the

---

1. *Bine v. Sterling Drugs,* 422 S.W.2d 623 (Mo. 1968) ($175,000 held excessive); *Griffith v. St.* Louis-S.F. R.R., 559 S.W.2d 278 (Mo.App.1977) ($150,000 deemed adequate).

loss of an eye.[2] Not one of these cases involved multiple handicaps, which resulted from the loss of the eye, as is the case with Stineman.

The jury in returning a damage award of $800,000 and Judge Wangelin in denying Fontbonne's motion for Judgment Notwithstanding the Verdict or the alternative motions for Remittitur and a new trial had an opportunity to see the plaintiff and to judge the credibility of all the witnesses. The jury had an opportunity to directly view the extent of injury in this case and Judge Wangelin did not find the award plainly unjust or shocking.

The record discloses that the possibility of plaintiff's total loss of vision is devastating. Stineman would lose contact with the rest of the world. Because of this possibility Stineman has been required to restructure her lifestyle. She now wears glasses to protect her seeing eye as well as to relieve the strain on it. She must be careful to always position herself against blows to her seeing eye by sitting with the eye facing the wall. She can no longer participate in any sports. Further, Stineman suffers from the disfigurement which accompanies her injury. Her blind eye is shrinking and will continue to do so until it becomes the size of a pea. Therefore she must now wear a prosthesis on her eye.

Stineman, as a young woman of twenty-three, is now suffering from three disabilities: her deafness; her partial blindness; and the further disfigurement. In view of this I cannot say that the damage award was excessive. Further, I do not feel that judges sitting on the Court of Appeals should attempt to substitute their judgment for that of the jury and the presiding judge, all of whom had an opportunity to see the plaintiff in person and to judge the credibility of all the witnesses.

### ORDER

This matter is before the Court pursuant to a motion by the appellee to clarify our opinion. Pursuant to that motion we state that the effect of our opinion in this matter was to affirm a judgment of $600,000 unless the appellee chooses to pursue a new trial on the question of damages. Accord-

ingly, if the appellee files a remittitur and the original judgment is modified, interest at the rate of nine percent shall be awarded from the date of the original judgment. *See* Rule 37, Fed.R.App.P.; Mo.Ann.Stat. § 408.040 (Supp. 1981) (Vernon's). Such interest shall be applied to the modified judgment of $600,000.

---

**2.** *Anderson v. Burlington Northern, Inc.,* Cause No. 78–26694, Circuit Court of the City of St. Louis, State of Missouri, June 29, 1981, cur-

rently pending appeal as Cause No. 44977, Missouri Court of Appeals, Eastern District of Missouri.