Ronald D. KELLY, Plaintiff,

v.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Defendant.

No. 81–0381–CV–W–9–6.

United States District Court,
W.D. Missouri, W.D.

Dec. 10, 1982.

Donald G. Stouffer, Marshall, Mo., for plaintiff.

John W. Cowden, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for defendant.

MEMORANDUM AND ORDER DENYING MOTION FOR NEW TRIAL OR REMITTITUR

SACHS, District Judge.

Plaintiff Kelly, a recently promoted railroad conductor in his mid-thirties, lost the lower part of his left leg after falling near a moving train in the railroad yard at Slater, Missouri. The fall was occasioned by debris left in the yard, apparently a generator belt similar to the broken fan belt on an automobile, which probably became entangled in Kelly's legs as he walked along the darkened tracks in the night-time. Recent heavy rain left pools of water which

somewhat impeded walking and possibly concealed view of the generator belt. Kelly was in charge of the train, and had signaled for the train to begin moving out of the yard while he continued walking toward the rear of the train, to board the caboose after inspecting the cars.

Although an attempt was made to save his foot, which was almost completely severed, gangrene set in, and an amputation was required. During his recovery, Kelly worked as a boat salesman at the Lake of the Ozarks, and earned some $7,500 annually, approximately $20,000 less than his prospective income as a conductor. The stump of his leg became chronically and severely painful, however, due to an unusual growth of nerve endings. A second below-the-knee amputation was required. Shrinking in the stump will now require a new prosthesis. There is no sound basis for predicting serious additional physical complications, however, and no claim is asserted for possible new problems. The loss of Kelly's leg has considerably reduced the physical activity feasible for him, somewhat limiting his vocational choices, his opportunities for work around the house, and his recreational activities.

The major difference in testimony relating to damages in this FELA case was provided by two economists. Professor Shulenburger, called by defendant railroad company (ICG), relied on governmental statistics showing the average income differential suffered by disabled persons (25%), and calculated likely economic loss at $238,-410. Kelly's economist, Professor Ward, using the $7,500 post-injury income figure as a guide, calculated economic loss, reduced to present value, at $676,970.[1]

The jury found total damages to be $1,250,000, generally in accordance with plaintiff's proof and present claims, and deducted 10% for contributory negligence, leaving an award of $1,125,000.

ICG contends the non-economic losses should be valued, at maximum, at between $300,000 and $400,000. Kelly contends about $600,000 was probably allowed by the jury and is a reasonable or possibly insufficient figure.[2]

ICG seeks a new trial, or a remittitur. It asks that total damages be reduced to a maximum of $600,000, and that the Court allow plaintiff only $300,000, because Kelly is said to have shared equally in any negligence.

1.  *Contributory negligence.*

ICG is in error in asking the Court to order a remittitur based on the Court's view of the contributory negligence percentage. The Court cannot increase the jury's allocation to contributory negligence. *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898, 902 (2d Cir.1982). If the Court should conclude that the jury's allocation is clearly contrary to the weight of the evidence, the Court could, of course, grant a new trial.

■ Kelly correctly avers that the contributory negligence issues are not far removed from an "assumption of risk" issue which Congress has barred as a defense. 45 U.S.C. § 54. However, the jury did not interpose this issue as a complete defense. Moreover, Kelly's role as the person controlling both the movement of the train and his own physical motions (standing to await the caboose or walking toward it) places his conduct under scrutiny for contributory negligence. He chose to start the train

---

1.  The boat salesman occupation used by plaintiff is a rather arbitrary choice, as Kelly has now been advised that too much physical activity was required on that job. While awaiting a stabilization of his condition, and a new prosthesis, Kelly has been working part-time as a cashier at a tavern at the Lake of the Ozarks, earning even less money than as a salesman. His preference for living at the Lake and lack of planning as to a vocational future somewhat complicate a damage forecast. Neither side used a vocational expert to hazard an opinion as to the best paying available work Kelly could reasonably expect to perform in his mid-Missouri residential area.

2.  If the Court were making an independent valuation it would agree with ICG that $400,-000 would be more than adequate for non-economic damages, based on its observations of Kelly and its impression of the testimony. But the Court is not the fact finder.

while continuing to walk, knowing the general hazards involved. ICG was directly responsible for the condition of the yard, however, including the lighting, the footing, the drainage system and the debris collection. Because Kelly was in most immediate control and had the best personal knowledge of all hazards, if the Court were making an allocation it would most likely have placed contributory negligence at 50%, or perhaps 33⅓% (taking into account ICG's greater duty in providing a safe place for its employees to work). The jury's decision thrusting almost the entire duty of care on ICG is questionable, but is not so clearly unreasonable as to require a new trial.

The Court therefore accepts the jury's decision to allocate 90% of the damage recovery to Kelly.

### 2. *Alleged excessive damages*

■ The Seventh Amendment commands the utmost judicial restraint in reexamining any fact tried by a jury. Any such reexamination is "full of delicacy and difficulty." *Blunt v. Little,* 3 Fed.Cas. 760, 761 (D.Mass.1822—Story, Circuit Justice) (No. 1578). Under current standards, it is said that a new trial or remittitur may only be ordered when the trial court is convinced that the first trial has resulted in a "miscarriage of justice." *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 187 (8th Cir.1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). "Ordinarily, remittitur is to be granted [by a trial court] only where the verdict is 'so grossly excessive as to shock the conscience of [the] court'". *Ouachita Nat. Bank v. Tosco Corp.,* 686 F.2d 1291, 1295 (8th Cir.1982). The test has been phrased in this district as "whether the trial judge is left with the definite and firm conviction that a clear miscarriage of justice has occurred." *Seven Provinces Ins. Co., Ltd. v. Commerce & Industry Ins. Co.,* 65 F.R.D. 674, 688 (W.D.

Mo.1975—Becker, Chief Judge). Judge Becker's adjectives are not to be disregarded. Former Chief Judge Oliver quoted, with apparent approval, a comment comparing federal and state practice, concluding with a lawyer's generalization that " 'in the federal courts ... you keep what you get and both sides know it ...' ". *Beanland v. Chicago, Rock Island & Pacific R. Co.,* 345 F.Supp. 220, 224 n. 1 (W.D.Mo. 1972), rev'd. on other grounds, 480 F.2d 109 (8th Cir.1973).

It would appear that remittiturs are less frequent in this district in personal injury cases than in cases in which a damage evaluation or calculation can be more clearly determined from the evidence. *United States v. 86.52 Acres of Land,* 250 F.Supp. 619, 621 (W.D.Mo.1966—Oliver, J.). But see *Pierce v. Der Wienerschnitzel International, Inc.,* 313 F.Supp. 740 (W.D.Mo.1970—Becker, Chief Judge) (personal injury remittitur).

The limits of appropriate district court restraint are marked by the 1981 decision in *Stineman v. Fontbonne College,* 664 F.2d 1082 (8th Cir.1981). In that case both the trial judge and Senior District Judge Nichol, sitting on appeal by designation, would have allowed an $800,000 verdict for loss of an eye to stand, even in the absence of pain and suffering at the level presented in this case, and absent significant proof of future economic loss. I am confident that the same judges would have accepted an $80,-000 verdict. The appellate majority, however, consisting of Judges Heaney and Henley, reversed and required a remittitur, but only to the sum of $600,000.[3]

■ The judicially-approved $600,000 award in *Stineman* establishes a guideline which mandates, in my judgment, that there be no significant remittitur in the present case. Although this Court as trier might have evaluated the evidence entirely

---

**3.** A factor favoring an enlarged recovery in *Stineman,* not present here, was the preexisting deafness of plaintiff Stineman, which "forces reliance upon her eyesight in order to communicate." *Id.* at 1088. This extreme reliance on her remaining eye caused her "to restructure

her lifestyle." *Id.* at 1090. None of the judges, however, apparently considered there could be an enhanced award to prepay the plaintiff for the "devastating" but quite improbable "total loss of vision." *Id.*

differently, it is the duty of the Court to restrain its sense of "shock" if the Seventh Amendment is to be given full play. A personal injury verdict which one judge may consider to be two or three times too high, or two or three times too low, can rarely be classified in such extravagant terms as "a clear miscarriage of justice" or "shocking" to the conscience. The subject defies reliable approximations in valuation when the divergent views of jurors must be duly honored.[4] In other words, the concept of reasonableness covers a very broad spectrum indeed. In this case, candor forces me to disclose for purposes of appellate review that I believe a recovery ranging from about $1,250,000 down to $125,000 or even less would be reasonable. If it is my judicial duty to draw tighter lines, I invite appellate correction, and seek no deference to expertise.[5]

The Court of Appeals may desire an explanation of the comment that I could accept a damage valuation far below the economic loss calculated by defendant's expert witness, Dr. Ward. It is my judgment that the jury could have concluded that neither expert produced a reliable forecast of Kelly's future income, and that his future losses are too speculative to evaluate. In a prior footnote I have indicated my view that a forecast of $7,500 income, though based on past experience, is hardly better than a figure picked from the air, when looking to the future. Defendant's expert, on the other hand, simply relied on averages showing that handicapped people generally earn less than people without handicaps. But such an analysis includes a multitude of handicaps. My observation of

plaintiff was that he seemed to have intelligence, ability and personable qualities which gave him potential earning capacity hardly impeded by his loss of a leg. He received Navy training on complex Sonar equipment, and was apparently able to handle the training. His vocational reeducation and prospects are dependent on untried and unconsidered factors in this case. They rest a good deal on immeasurables such as luck, incentive and ambition. I would not quarrel with a conclusion that Kelly will suffer *no* foreseeable loss of future income, or that his loss will be considerably less than the average for all handicapped persons. The jury's apparent view that Dr. Ward was the more reliable expert is a conclusion that I find barely acceptable, and I acknowledge considerable scepticism as to his forecasts, unless, of course, Kelly chooses to be monetarily unambitious.

The possibility of a small remittitur (probably 10% or less) has been considered, based on Dr. Ward's failure to include in his equation the benefit Kelly would receive by reason of paying lower income taxes on his hypothetical losses of income. The subject is speculative and complicated, and it seems that fair trial on this issue was adequately covered by providing defendant with the opportunity to cross-examine Dr. Ward on his methodology. *See Norfolk & Western R. Co. v. Liepelt,* 444 U.S. 490, 494–5, 100 S.Ct. 755, 757, 758, 62 L.Ed.2d 689 (1980). In light of all the variables in this case, the Court should not attempt to use a crystal ball on this one item, especially without evidence of the jury's economic calculations by way of interrogatories.[6]

---

4. Presumably this was one of the great hazards of litigation which caused Judge Learned Hand to observe, at the conclusion of a lengthy district court career, that litigants " 'should dread a law suit beyond almost anything else short of sickness .and death' ". *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 239, 85 S.Ct. 411, 418, 13 L.Ed.2d 248 (1964) (concurring opinion of Justice Goldberg).

5. This case stands almost alone in my judicial experience. Juries during the past three years have given most defendants very little cause for seeking remittiturs. In declining defendant's request here, I find some comfort in Judge

Kelly's approval of a 1980 verdict in Kansas for a comparable sum where there was a leg injury not requiring amputation, and the economic loss was not as great as was here claimed. *Nye v. Fenton,* 496 F.Supp. 136 (D.Kan.1980).

6. Neither side asked the Court to submit the case on special verdict forms, or sought answers to interrogatories under Rule 49, F.R.Civ. Proc. For purposes of post-trial review of the verdict, such procedures would doubtless have been desirable and may be used more frequently by the Court, although they do present trial difficulties which make them unpopular with lawyers and trial judges.

This case was ably tried by good lawyers on both sides. No improper appeal to passion occurred. Even though the result may have been too generous and was doubtless surprising, the jury's word on a question like this should almost always be final. Although the recovery here presses allowable limits, I am unable to declare the verdict "shocking" or to announce a "firm conviction" that a "clear miscarriage of justice" has occurred.

Defendant's post-trial motions will be denied. SO ORDERED.