Robert STAFFORD, Appellant,

v.

NEUROLOGICAL MEDICINE, INC.
and Raymond F. Cohen,
D.O., Appellees.

No. 86–1352.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1986.

Decided Feb. 11, 1987.

Rehearing Denied March 27, 1987.

Alvin A. Wolff, Jr., St. Louis, Mo., for appellant.

David I. Hares, St. Charles, Mo., for appellees.

Before JOHN R. GIBSON, FAGG and MAGILL, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Robert Stafford brought this negligence action against Neurological Medicine, Inc. (NMI), and Dr. Raymond F. Cohen based on an insurance form signed by Dr. Cohen which incorrectly stated that Stafford's wife, Pauline, was "diagnosed" as having a brain tumor. Two days after reading this form, Pauline committed suicide. A jury returned a verdict for $200,000. The district court, however, granted both defendants' motions for judgment notwithstanding the verdict, reasoning that the evidence failed to create a submissible jury question on the element of causation. It also conditionally granted a new trial for both defendants, stating that "as to both liability and damages the jury's verdict in this cause was against the great weight of the evidence." *Stafford v. Neurological Medicine, Inc.,* No. 85-486C(C) (E.D.Mo. Mar. 5, 1986). We reverse and remand for entry of judgment on the jury's verdict.

## I.

On the morning of January 14, 1985, Robert Stafford went out to chop wood on the eighty acres surrounding the farm home where he and his wife Pauline had lived since their marriage in 1952. Pauline stayed inside. She typed her husband's business agenda, as she always did, for his Tuesday night meeting. She apparently then began preparing dinner, setting sweet potatoes and utensils on the kitchen counter and placing frozen beef liver in a saucer to thaw. Then, she hung herself. Stafford found his wife around 11:00 a.m.

During August 1984, Pauline Stafford was hospitalized for a bladder disorder. Tests conducted during her stay revealed that she had lung cancer. Further tests determined, however, that the cancer had not spread to other parts of her body. Surgery performed in September 1984 to remove the lung cancer was apparently successful, and Pauline returned home with her doctors' assurances that the lung cancer had been removed, the cancer had not spread, and she stood a good chance of recovery.

Pauline received a CT scan test prior to surgery to determine whether the cancer had metastasized to her brain. Dr. Cohen, a neurologist and employee of NMI, read and interpreted the CT scan. He concluded, and everyone agreed at trial, that the test revealed no cancer. Dr. David Gardner, the cardiologist who evaluated Pauline to determine whether she should undergo surgery for lung cancer, told Pauline and Mr. Stafford that she did not have a brain tumor and that there was no evidence that the lung cancer had spread.

NMI charged the Staffords $129.00 for reading and interpreting the CT scan. Since Pauline was covered by Medicare, NMI submitted the charge to General American Insurance Company, the regional Medicare fiscal intermediary. Pauline signed a blank Medicare claim form titled HCFA form 1500. In accordance with Dr. Cohen's instructions, NMI's clerical staff

then completed the claim information on the form, stamped it with Dr. Cohen's signature, and mailed it to General American.

Box 23A of HCFA form 1500 was titled "Diagnosis or Nature of Illness or Injury." Upon Dr. Cohen's instruction, an NMI employee wrote the words "brain tumor" in box 23A of Pauline's form. The appellees' position throughout trial was that while Pauline was never diagnosed as suffering from a brain tumor, General American prohibited the use of a "rule out diagnosis" when an HCFA form 1500 was submitted to obtain payment for a CT scan. Thus, for example, the form, using the accepted rule out abbreviation, could not be submitted with the phrase "R/O brain tumor" in box 23A. The appellees were thus forced to use, as they termed it, a provisional diagnosis. They contended this prohibition applied only to CT scans. Several witnesses testified that on prior occasions Dr. Cohen's office had submitted a rule out diagnosis to General American, and the form had been returned unpaid. Dr. Cohen's staff would then white-out the "R/O portion of the diagnosis, resubmit the form to General American, and ultimately receive the Medicare payment. Thus, Dr. Cohen and his associate, Dr. Sherrod, testified that while they would have felt more comfortable using rule out diagnoses on HCFA form 1500s, they felt compelled to follow General American's policy.

After receiving Pauline's HCFA form 1500, General American paid its portion of the claim and, apparently, sent a copy of the form to MJM Electrical Cooperative, the company through which the Staffords maintained a secondary insurance policy. MJM had standing orders from Stafford to send a copy of all insurance-related documents to his home. Accordingly, on either Friday, January 11, or Saturday, January 12, 1985, Stafford received a letter in the mail from MJM concerning the payment of Pauline's medical bill. He opened the letter around 4:00 p.m. on Saturday. Attached to the letter was the HCFA form 1500 containing the words "brain tumor" under the heading "Diagnosis or Nature of Illness or Injury." Stafford placed the form on the table. Pauline picked it up and read it.

Stafford testified that Pauline became withdrawn immediately after reading the form. Her actions over the next two days, while not unusual when viewed in the abstract, were in sharp contrast, according to Stafford, to her usual behavior and routines. After reading the claim form, Pauline did some ironing—something she had never done on a Saturday night—and then went to bed early. She stopped talking; when Stafford tried to talk to her, she did not reply. Stafford described Pauline as "deeply depressed" on Sunday, unable to carry on a conversation. She did remark, however, that she was going to call the doctor on Monday and "have him tell me the truth about the brain tumor." She went to bed early on Sunday, perhaps before *60 Minutes* aired at 6:00 p.m. Stafford testified that they "usually solved all the problems of the world at the breakfast table," but on Monday morning they had no conversation. After breakfast, Stafford went outside to chop wood. When he returned, Pauline was dead.

Stafford brought this action, contending that Dr. Cohen and NMI negligently inserted the words "brain tumor" on the HCFA form 1500 and that their negligence caused Pauline's death. Stafford contended, and psychiatric expert Dr. David Shepard testified, that when Pauline learned of the incorrect brain tumor "diagnosis," it created an impulse control disorder that caused her impulsive suicide. Both defendants moved for a directed verdict at the close of the plaintiff's case and after the presentation of their evidence. These motions were denied. The jury returned a verdict against both Dr. Cohen and NMI, and awarded Stafford $200,000.

The district court reversed the jury's verdicts, granting judgment n.o.v. for both Dr. Cohen and NMI on the basis that the evidence failed to create a submissible jury issue on the element of proximate causation. The district court also conditionally granted a new trial.

## II.

A judgment n.o.v. may be entered only if all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party. *E.g., Brown v. Syntex Laboratories, Inc.,* 755 F.2d 668, 671 (8th Cir.1985); *Jasperson v. Purolator Courier Corp.,* 765 F.2d 736, 741 (8th Cir.1985). In applying this standard, the district court was required to consider all evidence in the light most favorable to Stafford, assume that the jury resolved all evidentiary conflicts in his favor, assume as true all facts the evidence tended to prove, and give Stafford the benefit of all favorable inferences that could be drawn from the facts proved. *See, e.g., Gilkerson v. Toastmaster, Inc.,* 770 F.2d 133, 136 (8th Cir.1985); *Midwest Communications, Inc. v. Minnesota Twins, Inc.,* 779 F.2d 444, 455 (8th Cir. 1985), *cert. denied,* — U.S. —, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

Under Missouri law, Stafford was required to prove that the appellees' allegedly negligent acts—writing the words "brain tumor" on the HCFA form 1500 and sending it to General American—could "be reasonably regarded as a direct, producing or efficient cause; or as entering into and forming a part of the direct, producing or efficient cause of the injury." *McConnell v. Pic-Walsh Freight Co.,* 432 S.W.2d 292, 297 (Mo.1968). "Proof of proximate cause may be established from either direct or circumstantial evidence." *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.,* 700 S.W.2d 426, 434 (Mo.1985) (en banc).

■ At trial Stafford attempted to prove, through expert testimony and circumstantial evidence, that Pauline's reading of the words "brain tumor" caused an impulse control disorder in that Pauline suffered from an irresistible impulse to kill herself. Under Missouri law, when a person's actions cause a victim to become "insane and bereft of reason" such that the victim involuntarily commits suicide, the person's actions can constitute the proximate cause of the death. *Wallace v. Bounds,* 369 S.W.2d 138, 143-44 (Mo.1963).

An "irresistible impulse" is a form of insanity that could lead to an involuntary suicide. *See, e.g., Lemmon v. Continental Casualty Co.,* 350 Mo. 1107, 169 S.W.2d 920 (1943); *Garmon v. General American Life Insurance Co.,* 624 S.W.2d 42 (Mo.Ct. App.1981). *See generally* Restatement (Second) of Torts § 455 (1965) (actor liable if his negligent conduct causes another's insanity, making it impossible for the other to resist an impulse caused by her insanity). Accordingly, the factual issue at trial was whether Pauline's learning of the "diagnosis" of brain tumor caused an impulsive suicide.

■ Dr. David Shepard, an expert in geriatric psychiatry, opined that Pauline's suicide resulted from an irresistible impulse—the product of an impulse control disorder caused by her learning of the "diagnosis" of her brain tumor. This testimony, standing alone, supported Stafford's position; accordingly, the standard for issuing a judgment n.o.v. was not met. *See Brown v. Syntex Laboratories, Inc.,* 755 F.2d at 671 (judgment n.o.v. reversed because properly admitted expert testimony supported non-moving party's position). It makes little difference that the appellees attacked Dr. Shepard's credibility, questioned the validity of his opinions, and introduced their own expert testimony, which contradicted Dr. Shepard's opinions. This simply required the jury to assess and evaluate the strengths and weaknesses of the two experts' conflicting testimonies—a task particularly within the factfinder's province. *See Hoefelman v. Conservation Commission of Missouri,* 718 F.2d 281, 285 (8th Cir.1983).

Moreover, there was substantial testimony concerning Pauline's activities on Monday morning and her behavior on Saturday and Sunday to support the conclusion that Pauline killed herself impulsively and that this irresistible impulse was caused by her reading the "diagnosis" of brain tumor. Similarly, there was substantial evidence to rebut the appellees' theory, and their expert's opinion, that Pauline's suicide was the result of an ongoing depression

brought on by a personal and family history of medical problems. Pauline did have a history of medical problems. Yet the record is devoid of testimony showing that Pauline suffered an ongoing depression. To the contrary, she was described by doctors, friends, and her husband as a balanced, positive, and productive person. This evidence raised issues requiring the jury's consideration.

### III.

We now turn to the propriety of the district court's brief order granting a new trial.

In *Goldsmith v. Diamond Shamrock Corp.*, 767 F.2d 411 (8th Cir.1985), this court stated:

In *Fireman's Fund Insurance Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 187 (8th Cir.1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973), we emphasized that a verdict to be disturbed must have been against the "clear weight," "overwhelming weight," or "great weight" of the evidence. Such a determination, we stressed, involves a judicial balancing by the district court as to whether the first trial resulted in a miscarriage of justice. *The district court's abbreviated treatment of this question in this case does not demonstrate that it engaged in an appropriate balancing or found a miscarriage of justice, or that it in any meaningful way applied the teaching of Fireman's Fund.*

*Id.* at 416 (emphasis added).

■ As in *Diamond Shamrock*, the district court failed to "demonstrate that it engaged in an appropriate balancing or found a miscarriage of justice." *Id.* The district court stated, without elaboration, that "as to both liability and damages the jury's verdict in this cause was against the great weight of the evidence." *Stafford v. Neurological Medicine, Inc.*, No. 85–486C(5) (E.D.Mo. Mar. 5, 1985). This order only states the conclusion required by *Fireman's Fund* and *Diamond Shamrock* —that the verdict was against the "great weight" of the evidence. The court's order completely lacks the analysis required by those cases. *See also Syntex Laboratories, Inc.*, 755 F.2d at 673. Granting a new trial based on the insufficiency of the evidence involves an analytical exercise peculiarly within the district court's province. *See Green v. American Airlines, Inc.*, 804 F.2d 453 (8th Cir.1986). With this authority comes the need to give reasons. A district court does not properly exercise its discretionary authority when it fails to articulate the analysis utilized to justify upsetting a jury's verdict. Moreover, based on the entire record, we believe the district court's decision to grant a new trial was an abuse of discretion, and reversal is thus required. We emphasize that in reviewing the record we are not making initial determinations. Instead, we only consider whether, based on the entire record, the district court's determination that the jury's verdict was against the great weight of the evidence constitutes an abuse of discretion.

■ To prove negligence under Missouri law, Stafford was required to prove that the nature of foreseeable harm resulting from the appellees' actions was such that a reasonably prudent person in like circumstances would have refrained from acting in such a manner. *See Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d at 426. In other words, Stafford had to prove that the burden encountered by not placing an incorrect positive "diagnosis" on Medicare claim forms submitted for CT scans was outweighed by the nature and probability of foreseeable injury attributable to the appellees' actions.

■ A jury could reasonably conclude that NMI did foresee or should have foreseen the significant possibility that NMI's patients would ultimately see a copy of Medicare claim forms submitted to General American. Both Dr. Cohen and his associate, Dr. Sherrod, testified they were aware that many Medicare patients had secondary insurance carriers and that the portion of their bill not paid by Medicare would be billed to such insurance carriers or directly

to the patients. Dr. Cohen also acknowledged that the HCFA form 1500 made reference to "other" or secondary insurance. An NMI employee testified that once the HCFA form 1500 was sent to General American, it was out of NMI's control.

There was also evidence tending to prove the foreseeability of harm to Pauline if she did receive the diagnosis. Dr. Shepard testified that the elderly are particularly susceptible to harm resulting from stressful events, such as the receipt of a medical form containing a diagnosis of brain tumor. Drs. Cohen and Sherrod both stated they would not intentionally give such incorrect information to a patient, and Dr. Sherrod testified that he would be very concerned about a person who received such data. This, coupled with what the appellees knew or should have known about Pauline's age and medical history and her current status as a recovering cancer surgery patient, leads to the reasonable conclusion that the appellees should have foreseen the significant possibility that Pauline would suffer harm if she received the diagnosis.

Despite the significant foreseeability of harm, the appellees argued that to disobey General American's policy against rule out diagnoses constituted an unreasonable burden. Doubts were raised at trial, however, as to whether this burden existed and, if it did, its actual extent. Drs. Cohen and Sherrod testified that they desired not to follow General American's policy. Yet, the true extent, if any, of the burden associated with a refusal to comply with this policy was never proved; no one from NMI ever made an unsuccessful attempt to convince General American to alter the policy. This is especially significant in light of evidence showing uncertainty as to the policy's true inflexibility. A May 1981 General American newsletter stating a blanket prohibition against rule out diagnoses was introduced into evidence. One NMI secretary testified, however, that she routinely submitted and was paid for claims for procedures other than CT scans despite NMI's use of a rule out diagnosis. Consistently, the appellees claimed that this prohibition applied only to diagnoses resulting from CT scans.

Thus, one must question how unyielding General American would have been to a refusal by NMI to follow the policy.

The jury was presented evidence both indicating the unreasonableness of the appellees' actions and justifying their actions. As discussed earlier, there was also substantial evidence concerning causation. The conflicts raised by this evidence should have been resolved by the jury, and we believe the district court abused its discretion in concluding that, as to liability, the jury's verdict was against the great weight of the evidence. In reaching this holding, we do not construe the evidence or make reasonable inferences in Stafford's favor. Still, viewing the evidence objectively, we believe a district court would abuse its discretion in holding that the jury's conclusion that the appellees' negligent actions caused Pauline's suicide was a miscarriage of justice.

 Finally, we hold that the trial court abused its discretion in conditionally granting a new trial on the issue of damages. A new trial may not be granted on the grounds that a jury's verdict is excessive unless the court concludes that the jury's verdict is a "plain injustice" or a "monstrous" or "shocking" result. *See, e.g., School District No. 11 v. Sverdrup & Parcel & Associates, Inc.*, 797 F.2d 651, 654 (8th Cir.1986); *DeFranco v. Valley Forge Insurance Co.*, 754 F.2d 293, 296 (8th Cir.1985) ("so large as to shock the judicial conscience"). Moreover, the assessment of damages is especially within the jury's sound discretion when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms. *See, e.g., Vanskike v. Union Pacific Railroad Co.*, 725 F.2d 1146 (8th Cir.1984); *Stineman v. Fontbonne College*, 664 F.2d 1082 (8th Cir.1981). After hearing extensive testimony concerning Mr. Stafford and Pauline's relationship, the effect of her death on him, and the expenses attributable to her death, the jury awarded Stafford $200,000. We conclude a district court would abuse its discretion in

holding that this amount was so excessive under Missouri law as to constitute a shocking result.

The orders of the district court granting judgment n.o.v. and a conditional new trial are reversed. We remand this action to the district court with instructions to enter judgment in accordance with the jury's verdict.