**AMERICAN FAMILY SERVICE CORPORATION, Appellant,**

v.

**Pamela MICHELFELDER; Ted Michelfelder; Michelfelder, Inc.; Institute of Child Development, Inc.; Shearer Hintze & Templer, a professional corporation; G. Brian Pingel; Apple Tree Children's Center, Inc., Appellees.**

v.

**NATIONAL SITE DEVELOPMENT, INC.; Dick Richards.**

No. 91–2421.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1992.

Decided July 1, 1992.

David Wawro, New York City, argued, for appellant.

Roy M. Irish, Des Moines, Iowa, argued, for appellees.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

After a jury awarded American Family Service Corporation $480,183.70 for fraud and contract claims against the defendants, the district court entered judgment notwithstanding the verdict for some of the defendants and reduced the total damage award against the others to $57,625.70. American Family Service Corporation appeals. We reverse and reinstate the jury's verdict.

## FACTS [1]

Starting in 1987, American Family Service Corporation ("AFSC") began negotiating with Pamela Michelfelder, Ted Michelfelder, Michelfelder, Inc., and the Institute of Child Development, Inc. (collectively, "the Michelfelders") to purchase the Michelfelders' child care business. As the negotiations continued, AFSC realized that the Michelfelders were negotiating with another potential buyer. Fearing that the Michelfelders intended to create a bidding war, AFSC refused to continue negotiating for the child care business without a guarantee of exclusive bargaining rights. The Michelfelders responded by sending AFSC an April 24, 1989 letter promising that "we will not negotiate with any other buyer until you have the opportunity to complete your due diligence and a definitive agreement has been achieved." This assurance satisfied AFSC, and the negotiations between it and the Michelfelders continued. On June 7, 1989, the Michelfelders met with Brian Pingel, a member of the Shearer, Hintze & Templer law firm ("the Shearer firm") to discuss retaining the Shearer firm to replace the Michelfelders' counsel and to represent them in the negotiations to sell their business. The next day the Michelfelders instructed their former counsel to forward the relevant files to Pingel, who then began representing the Michelfelders with regard to the sale of their business.

A few days later, AFSC and the Michelfelders, who were now represented by Pin-

---

1. For the most part, the parties do not dispute the facts. Where disagreements arise, we have noted the conflicting testimony. In the Discussion sections *infra,* we state the controlling standards of review.

gel, signed a letter of intent agreeing to sell their business to AFSC. The letter of intent contained the following "no-shop clause":

> [N]either the Companies nor any shareholder, officer, director, agent or representative or any of them shall, directly or indirectly, solicit any proposal to acquire any or all of the Business Assets, any or all of the stock of the Companies, or negotiate or enter into any discussions with any person concerning such matters.

After the parties signed the letter of intent, AFSC began making the legal and financial arrangements necessary to consummate the purchase.[2]

Unbeknownst to AFSC, the Michelfelders continued to negotiate with Lloyd Clarke, another potential buyer of the Michelfelders' business. In fact, two days after AFSC received the signed letter of intent, Pamela Michelfelder met with Clarke to discuss the status of their negotiations. On June 23, 1989, Pamela Michelfelder met with Pingel and Ronni Begleiter, a Shearer lawyer, for advice concerning signing a proposed letter of intent with Clarke. During this meeting, Michelfelder discussed the AFSC letter of intent with the Shearer lawyers. Each of the Shearer lawyers advised Michelfelder that entering into an agreement with Clarke could expose Michelfelder to damage claims by AFSC. According to Pingel, during this meeting it became clear to him that Michelfelder had no intention of honoring her commitment to AFSC not to negotiate with other potential buyers. On the same day, June 23, 1989, the Michelfelders and Clarke signed an agreement in principle under which Clarke would buy the child care business. Both Pingel and Begleiter were aware of this

agreement. Indeed, the Shearer lawyers testified that throughout the summer of 1989, they assisted the Michelfelders' negotiations with both AFSC and Clarke[3] and that they did not disclose the Clarke negotiations to AFSC.[4] The Michelfelders compensated the Shearer firm for its assistance with both negotiations.

On July 12, 1989, AFSC's lawyers requested in writing that Pingel forward to them:

> 27. Certificates and agreements of merger, consolidation, or other corporate reorganizations, if any.

> 28. All documents relating to major acquisitions or dispositions by any of the [Michelfelders'] Companies in the last five years or currently proposed for the future.

Despite the specificity of the requests, Pingel never forwarded the Michelfelders' agreement in principle with Clarke. In a July 13, 1989 letter from the Shearer firm to the Michelfelders regarding these requests, Begleiter stated that "I suspect that there are no documents fitting Items ... 27–29." Recognizing the problems created by the requests, Begleiter concluded:

> We can certainly send this material seriatim or we can compile it all and suggest that they fly out to examine it. If you would prefer that the AFSC lawyers not come to Des Moines until you know for sure where you stand with Lloyd Clark[e], we can certainly suggest that we meet in Chicago.

That same day, Begleiter wrote AFSC's lawyers with the Michelfelders' comments regarding a draft Asset Purchase Agreement prepared by AFSC. The letter also chronicled certain material business devel-

---

**2.** For instance, AFSC retained corporate counsel to review real estate titles, appraisers to "bring forward" the Michelfelders' real estate appraisals, and accountants to review the Michelfelders' financial statements. AFSC also applied for child care licenses in several states, analyzed the Michelfelders' business, conducted an employee search, and met with bankers to discuss a merger and refinancing once the Michelfelders' business was acquired.

**3.** When asked if she worked on both the Clarke and AFSC "projects, throughout the summer of 1989," Begleiter answered "yes." Similarly, when asked whether "simultaneously with those negotiations with Clarke, your firm was also working on the deal with AFSC," Pingel responded "that's correct."

**4.** Pingel testified that he "certainly didn't have it in mind to disclose" the Clarke negotiations to AFSC and that he "wasn't going to tell AFSC" about the Clarke negotiations.

opments affecting the Michelfelders' business, but conspicuously failed to note the Michelfelders' negotiations with Clarke.

In late July, the Shearer firm received a draft purchase agreement from Clarke's attorneys. Begleiter testified that this document spurred the intensity of the negotiations between Clarke and the Michelfelders. On August 2, 1989, less than a week after receiving the Clarke draft, Begleiter participated in a conference call with AFSC and its lawyers to discuss the Michelfelders' response to AFSC's draft purchase agreement. AFSC's chairman testified that Begleiter ended the call by stating that she was not aware of any impediments to closing the deal. Begleiter, on the other hand, testified that she concluded the call by stating something to the effect that she thought the Michelfelders could "live with" the AFSC's draft purchase agreement.[5]

That same day, Begleiter and Pingel discussed terminating negotiations with AFSC. Sometime during the following two weeks, Pingel instructed Begleiter to draft a letter ending negotiations with AFSC. While she was working on this letter, Begleiter continued to forward due diligence materials to AFSC, but did not mention anything about terminating negotiations.

On August 21, 1989, AFSC's lawyers sent the Shearer firm a revised purchase agreement. Three days later, Pamela Michelfelder instructed her business broker to inform AFSC that she was prepared to close the deal; the broker promptly relayed the message to AFSC. On the same day, however, Michelfelder met with Clarke and decided to complete the deal with him, and therefore directed the Shearer firm to send a letter terminating discussions with AFSC. The following day, Pingel wrote AFSC's attorney that the Michelfelders "are no longer interested in attempting to negoti-

ate the sale of the assets of their child care business."

On August 29, 1989, the Michelfelders and Clarke executed contracts to convey the child care business. When AFSC learned of these contracts, it immediately notified the Michelfelders that it intended to sue for damages. On September 1, 1989, the Michelfelders informed Clarke of this development. He rescinded the contracts on the following day.

## PROCEEDINGS

AFSC brought this diversity action against the Michelfelders, the Shearer firm, and Pingel, charging the Michelfelders with breach of contract and fraud, the Shearer firm and Pingel with fraud, and the defendants collectively with conspiracy. After a multi-week trial, the district court directed a verdict dismissing AFSC's conspiracy claim and submitted the remaining charges for jury consideration. The jury returned verdicts in favor of AFSC on each of its claims, awarding it $57,625.70 on its breach of contract claim against the Michelfelders, $253,534.80 on its fraud claim against the Michelfelders, $84,511.60 on its fraud claim against the Shearer firm, and $84,511.60 on its fraud claim against Pingel.

Each of the defendants moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The district court refused to alter the breach of contract verdict, capped the total recovery for the fraud and the breach of contract claims against the Michelfelders at $57,625.70, and granted judgment notwithstanding the verdict for the Shearer firm and Pingel. The court also ruled that a reversal of its judgments would entitle the defendants to a new trial on the fraud claims. AFSC ap-

---

**5.** Regarding the substance of her concluding comments, Begleiter testified:

> I think what I may have said is that I thought we should be able to live with this agreement, meaning the written document that AFSC had sent. Sometimes you'll do a deal and you think you have an agreement, then the other side will send in a document where they have pushed every point to about

as far as it can go, and you just go "We're going to have to go back to the drawing board on this. This document does not reflect the reality that I thought we had." The document that the AFSC sent us was not that kind of document, and I think I may have said something [sic], "I think this is a good document," or, "I think we can live with this document," or something like that.

peals these decisions, as well as the district court's dismissal of its conspiracy claim.

## DISCUSSION

### I. Reduction of Fraud Damages

AFSC first argues that the district court erred in capping the jury's damage award on both the breach of contract and fraud claims against the Michelfelders at $57,625.70. We agree.

With regard to fraud damages, AFSC requested that the jury be instructed that "[t]he measure of damages for fraud is an amount that would put AFSC in as good a position as if the fraudulent representations had been true." The Michelfelders alternatively requested the following instructions:

> [In determining fraud damages], you shall consider the evidence presented by AFSC as to the reasonable value of the costs and expenses it would not have incurred had it known that the alleged representation of the Michelfelders was false when made.

The district court adopted AFSC's proposed instruction, which (as we discuss below) reflected Iowa's "benefit-of-the-bargain rule."

█ So instructed, the jury found that the Michelfelders' fraudulent misrepresentations caused AFSC $253,534.80 in damages. After receiving this verdict, the district court decided that the benefit-of-the-bargain rule did not apply here. According to the district court:

> The only damages AFSC suffered as a result of those misrepresentations were the damages also caused by the Michelfelders' breach of the no-shop clause—the damages of $57,625.70 that the jury attributed to that breach. The fraudulent misrepresentation[s], on this record, damaged AFSC in no greater amount. Indeed AFSC's principal officer Michael Connelly testified that if AFSC had learned Michelfelders were negotiating with the Clarke group, AFSC would have withdrawn at once from further negotiations. The fraudulent misrepresentations, like the breach of the no-shop

clause, simply resulted in AFSC incurring additional expenditures fixed by the jury in the sum of $57,625.70. The measure of damages for fraudulent misrepresentation plainly could not exceed the measure of damages for breach of the no-shop clause in the letter of intent. That was the essence of the alleged misrepresentation.

> In sum, the evidence in this record, and the application of this court's instructions on damages to the special verdicts on AFSC theories of recovery, yields a maximum verdict on fraudulent misrepresentation in the same amount as the verdict for breach of the no-shop clause: $57,625.70

We disagree. The district court reduced the fraud award because, in its opinion, the combined fraud and breach of contract damages could not exceed AFSC's out-of-pocket expenses. Under Iowa law, however, the jury's verdict entitled AFSC to two distinct damage awards: one for the Michelfelders' breach of contract and another for the Michelfelders' fraudulent misrepresentations. Hence, the breach of contract damages ($58,625.70) reflected AFSC's out-of-pocket costs, *see Yost v. City of Council Bluffs*, 471 N.W.2d 836, 840 (Iowa 1991), whereas the higher fraud damages ($253,534.80) accounted for AFSC's lost benefit from the failed bargain. "The purpose of the benefit-of-the-bargain rule is to put the defrauded party 'in the same financial position as if the fraudulent representations had been in fact true.'" *Cornell v. Wunschel*, 408 N.W.2d 369, 380 (Iowa 1987) (quoting D. Dobbs, *Handbook on the Law of Remedies*, § 9.2, at 595 (1973)). Permitting such an award was entirely appropriate here since "[t]he measure of damage in false representation claims is under the benefit of the bargain rule." *Air Host Cedar Rapids, Inc. v. Airport Comm'n*, 464 N.W.2d 450, 454 (Iowa 1990) (citation omitted).

█ The following trial evidence demonstrated that if the Michelfelders had dealt exclusively with AFSC as they promised, AFSC would have bought the Michelfelders' child care business and benefitted fi-

nancially from this acquisition. Both Pingel and Begleiter testified that, in the words of Begleiter, the Michelfelders' "paramount concern" was to sell their business during the summer of 1989. AFSC's expert witness testified that if AFSC had acquired the Michelfelders' business, AFSC would have experienced nearly a $3.5 million increase in net worth inclusive of the transactions costs. The Michelfelders' expert witness conceded that AFSC's computations were supported by financial statements, although he computed the damage figure to be $2.6 million and questioned whether the financial statements used were even applicable to AFSC's situation. Supporting these conclusions was Pamela Michelfelders' testimony that the value of the Clarke deal was worth $1.5 million more to the Michelfelders than the value of the AFSC deal.

This evidence convinced the jury that had the Michelfelders not defrauded AFSC, that is, if the Michelfelders had honored their promise to negotiate exclusively with AFSC, AFSC would have benefitted financially.[6] Therefore, under Iowa's benefit-of-the-bargain rule, AFSC is entitled to the jury's damage determination regarding the Michelfelders' fraud. *See Freeman v. Bonnes Trucking, Inc.*, 337 N.W.2d 871, 879 (Iowa 1983) (citing with approval *Restatement (Second) of Torts* § 549(2) (1977) ("The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.")).

## II. Judgment Notwithstanding the Verdict for the Lawyers

AFSC appeals the district court's judgment notwithstanding the verdict in favor of the Shearer firm and Pingel on AFSC's fraud claims against these defendants. In granting the lawyers' motion, the district court held that the lawyers' "misrepresentations were secondary and of little conse-

quence," and they "did no more than repeat what their principals, the Michelfelders, had themselves communicated and instructed the lawyers to communicate to AFSC." Moreover, according to the district court, AFSC failed to prove that the lawyers

> knew [the] Michelfelders had committed fraud when making those oral and written promises not to negotiate with other persons. Neither did AFSC prove by the requisite clear and convincing preponderance of the evidence that it relied on the lawyers' statements, or that it sustained damages by reason of the lawyers' alleged misrepresentations.

We disagree. The law regarding our review of a judgment notwithstanding the verdict is firmly established.

> A judgment n.o.v. may be entered only if all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party. In applying this standard, the district court was required to consider all evidence in the light most favorable to [the non-movant], assume that the jury resolved all evidentiary conflicts in his favor, assume as true all facts the evidence tended to prove, and give [the non-movant] the benefit of all favorable inferences that could be drawn from the facts proved.

*Stafford v. Neurological Medicine, Inc.*, 811 F.2d 470, 473 (8th Cir.1987).

To recover for fraudulent misrepresentation under Iowa law, AFSC must prove by a preponderance of clear, satisfactory, and convincing evidence that the lawyers knowingly made a false material representation to AFSC concerning the Michelfelders' sale of their child care business to AFSC with the intention of deceiving AFSC, and that AFSC justifiably relied on the truth of the misrepresentation, which must have been a proximate cause of AFSC's damages. *See Iowa Civil Jury Instructions* 810.1; *see also Kunkle Wa-*

---

**6.** The jury's verdict indicates that it considered the Michelfelders' fraud to be their failure to live up to their promise of exclusivity. The jury accordingly followed the district court's instruc-tions and awarded damages "in an amount that would put AFSC in as good a position as if the fraudulent misrepresentations had been true."

*ter & Elec. v. City of Prescott,* 347 N.W.2d 648, 653 (Iowa 1984).

AFSC contends that the lawyers made fraudulent misrepresentations to AFSC on at least five occasions: (1) despite AFSC's lawyers' July 12, 1989 request to receive from Pingel "all documents relating to major acquisitions or dispositions by any of the [Michelfelders'] Companies in the last five years or currently proposed for the future," Pingel did not send AFSC's lawyers the agreement in principle that the Michelfelders had already signed with Clarke; (2) Begleiter's July 13, 1989, letter to AFSC notified AFSC of "business developments" that might interfere with the sale of the Michelfelders' business to AFSC, but the letter failed to mention the agreement in principle with Clarke; (3) at the conclusion of an August 2, 1989 telephone conference with AFSC, Begleiter stated that she did not foresee any impediments to completing the deal, although on the same day, she discussed terminating the AFSC negotiations with Pingel, who instructed her to draft a termination letter to AFSC; (4) despite this early August decision, the Shearer firm continued to forward due diligence materials to AFSC; and (5) Pingel's August 25, 1989 letter to AFSC stated that the Michelfelders were "no longer interested in attempting to negotiate the sale of the assets of their child care business" when in fact the Michelfelders were prepared to sell their business to Clarke.

Under Iowa law, an agent has not committed fraud where "in making representations [he] has acted simply as the mouthpiece of his principal." *Kristerin Dev. Co. v. Granson Inv.,* 394 N.W.2d 325, 333 (Iowa 1986) (quoting *Riley v. Bell,* 120 Iowa 618, 95 N.W. 170, 171 (Iowa 1903)). According to the Supreme Court of Iowa, where the agent acts as a mere mouthpiece and does not make representations beyond those of his principal, the reliance element of a fraudulent misrepresentation claim cannot be satisfied.[7] *Id.*

 Here, however, some of the defendant-lawyers' actions and comments exceeded the fraudulent representations

made by the Michelfelders. For example, Begleiter's July 13, 1989 letter, which discussed business developments that affected AFSC's purchase of the Michelfelders' business but did not mention the agreement in principle with Clarke, might qualify as fraud by the lawyers. *See Cornell,* 408 N.W.2d at 374 ("Concealment of or failure to disclose a material fact can constitute fraud in Iowa."). We decline to discuss the merit of this argument because we are convinced that the Shearer lawyers acted as more than mouthpieces for the Michelfelders on two other occasions: first, when Pingel failed to disclose the agreement in principle with Clarke despite AFSC's specific request to receive "all documents relating to major acquisitions or dispositions by any of the [Michelfelders'] Companies in the last five years or currently proposed for the future," and second, when Begleiter concluded the August 2nd teleconference with the comment that she did not foresee any impediments to sealing the deal with AFSC. The judgment of the Shearer lawyers guided these acts. The Michelfelders were not informed of Pingel's decision not to provide the documents AFSC requested until after Pingel made the decision. *See supra* p. 669. Similarly, Begleiter's testimony indicates that she based her reassurance on her own judgment and not on that of the Michelfelders. *See* note 5 *supra.*

Pursuant to Iowa law, the district court instructed the jury that in order to justifiably rely on the lawyers' representations,

one or more of the following situations [must] exist":

. . . . .

4. The party making the representation knows of some special reason to expect that the other party will rely on the opinion.

As legal representatives for the Michelfelders, Pingel and Begleiter knew (or at least should have known) that AFSC relied on their representations. Any other conclusion would cripple Pingel and Begleiter's roles as the purveyors of business transac-

---

7. The lawyers do not dispute the conclusion that they are agents under Iowa law.

tions. If AFSC could not rely on Pingel and Begleiter's representations, then AFSC would have to constantly contact the Michelfelders to negotiate the transaction. As a result, the Michelfelders would be distracted from running their business. One of a lawyer's most marketable assets is that the lawyer's expertise of legal nuances frees the client to focus on business matters while the lawyer handles legal matters. If, however, adverse parties cannot rely on the lawyer's representations, then the lawyer's benefit to the client diminishes, since the adverse party will understandably want to collect information from a reliable source and not from an unaccountable attorney.

Of course, reliance is merely one of the elements necessary to sustain an action for fraudulent misrepresentation. Representation,[8] falsity, materiality, scienter, intent to deceive, and resulting injury and damage must also be proved. *See, e.g., Kunkle Water & Elec.*, 347 N.W.2d at 653. Pingel's deceit and Begleiter's reassurance undoubtedly satisfy the first four elements.

■ As for the latter two, "[t]hese [as well as the rest of the] elements are seldom susceptible to direct proof and may be proven by circumstantial evidence." *Id.* Throughout the negotiations, the Shearer lawyers consistently acted to conceal the Michelfelders' double-dealing from AFSC and to prevent AFSC from learning of the agreement in principle with Clarke. Giving AFSC "the benefit of all favorable inferences that c[an] be drawn from the facts provided," *Stafford*, 811 F.2d at 473, the jury could reasonably find that Begleiter intended to deceive AFSC when she offered her reassurance, as did Pingel when he withheld the requested information.

■ With respect to injury and damages, we recognize that it is difficult to isolate the damage caused distinctly by the lawyers' fraud. Still AFSC presented evidence showing that its net worth would have increased substantially had Begleiter's and Pingel's representations been true. As the

district court instructed the jury, under the benefit-of-the-bargain rule, "[t]he measure of damages for fraudulent misrepresentation is an amount that would put AFSC in as good a position as if the fraudulent misrepresentations had been true." Given the standards for evaluating a judgment notwithstanding the verdict, *see id.*, the evidence justified the jury's award of $84,511.60 for AFSC's fraud claim against the Shearer firm, and $84,511.60 on its fraud claim against Pingel.

### III. Grant of New Trial

As part of their post-trial motions, the defendants moved for new trials. Accordingly, the district court conditionally granted the Shearer firm, Pingel, and the Michelfelders new trials on the fraud claims against them should we reverse the district court's post-trial rulings. *See* Fed.R.Civ. Pro. 50(c).

"The district court, while possessing discretion to set aside a jury verdict and grant a new trial, may not do so merely because it believes that the evidence permitted different inferences or that another result would be more reasonable." *Blake v. J.C. Penney Co., Inc.*, 894 F.2d 274, 281 (8th Cir.1990) (citations omitted). As in *Blake*, the district court here granted the new trials for essentially the same reasons that it reduced the Michelfelders' fraud damages and granted the lawyers' j.n.o.v.: it believed that the jury instruction on fraud damages misled the jury into applying the benefit-of-the-bargain rule and that the evidence did not support a finding that the lawyers committed fraud. We have already discussed these issues in parts I & II *supra* and are persuaded both that the court properly instructed the jury regarding fraud damages and that a reasonable jury could find that the lawyers defrauded AFSC. "Accordingly, no valid purpose would be served by submitting [the fraud issues] to another jury." *Id.* (citation omitted). We thus reverse the order condition-

---

**8.** "Concealment of or failure to disclose a material fact can constitute fraud in Iowa." *Cornell,*

408 N.W.2d at 374.

ally granting the Michelfelders and the lawyers a new trial.[9]

### IV. Failure to Harmonize Jury Verdicts

 Noting that the jury's fraud damages awards of $253,534.80 against the Michelfelders, $84,511.60 against the Shearer firm, and $84,511.60 against Pingel correspond to a 60%–20%–20% division of the total fraud damages award of $422,558, AFSC claims that the jury improperly apportioned the damages. According to AFSC, when this occurs the court should correct the verdict by holding the defendants jointly and severally liable for the total damages. *See Lockard v. Missouri Pacific Ry. Co.*, 894 F.2d 299, 305 (8th Cir.1990).

The Shearer firm and Pingel concede that if the district court had not set aside the verdicts against them, the lawyers should be jointly and severally liable for the damage awards against them. We accept this concession, and therefore, the Shearer firm and Pingel are jointly and severally liable for the $169,023.20 damage award against them.[10] As for combining this amount with the fraud award against the Michelfelders and then holding each of the defendants jointly and severally liable for this combined total, we decline to do so for two reasons. First and foremost, "we cannot speculate concerning what the jury would have done had it made only a single award of [fraud] damages." *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 926 (Iowa 1979). Second, the fraud perpetrated by the lawyers (representing that the Michelfelders would sell their business to AFSC and failing to disclose the Clarke negotiations to AFSC) differed from that committed by the Michelfelders (representing that they would negotiate exclusively with AFSC).

### V. Dismissal of AFSC's Conspiracy Claim

AFSC finally contends that the district court erred in directing a verdict against AFSC on its conspiracy claims. We affirm the district court's ruling on this issue.[11]

### CONCLUSION

We reinstate the jury's verdicts on each of AFSC's claims. We additionally reverse the district court's conditional grant of a new trial, rule that the Shearer firm and Pingel are jointly and severally liable for the damages assessed against them, and affirm the district court's directed verdict against AFSC on its conspiracy claim.

---

**9.** The appellees' brief focuses solely on the lawyers' right to a new trial. The lawyers argue that three erroneous jury instructions justify the trial court's decision to conditionally grant a new trial. Two of these instructions respectively defined "representation" and outlined the situations in which one party could justifiably rely on another, while the third instruction presented the benefit-of-the-bargain rule for determining damages. The first two instructions to which the lawyers object accurately reflect Iowa law as presented in *Iowa Civil Jury Instructions* §§ 810.2 and 810.8. As for the damages instruction, we have already ruled on its validity in part I of this opinion.

The lawyers also argue that because the jury found that the Michelfelders contractually agreed to sell their business to AFSC on August 24, 1989, AFSC is precluded from claiming fraud damages since they received the property for which they were bargaining. The flaw in this argument is obvious: the day after they reached this contractual agreement, the Michelfelders, via Pingel, repudiated it, and so AFSC has never received the benefit for which it had bargained.

**10.** The lawyers contend that their liability for fraud should not exceed $57,625.70. We have discussed and decided this issue in part I *supra*. We thus reject the lawyers' contention.

**11.** In making this ruling, we note that the Iowa courts have never held attorneys and their clients liable for conspiring to defraud a third party.